Filed: October 6, 2011

IN THE SUPREME COURT OF THE STATE OF OREGON

MICHAEL ARKEN,
DALE CANNON, ROBYN CARRICO,
CAROL YOUNG, JOHN HAWKINS,
LESLIE HUNTER, RICK MULLINS,
S. M. RUONALA, PATRICIA THOMPSON-WESTOVER,
and MYRNA WILLIAMS,

Plaintiffs-Appellants,

v.

CITY OF PORTLAND,
WESTERN OREGON UNIVERSITY,
PORTLAND SCHOOL DISTRICT,
CITY OF GRESHAM, LINN COUNTY,
UNIVERSITY OF OREGON,
PORTLAND COMMUNITY COLLEGE,
MULTNOMAH COUNTY,
CENTRAL SCHOOL DISTRICT 13J,
FOREST GROVE SCHOOL DISTRICT #15,
and PUBLIC EMPLOYEES RETIREMENT BOARD,

Defendants-Respondents.

(CC 060100536; SC S058881 (Control))

RUTH ROBINSON,
GERALD BUTTON, NORMAN FABIAN,
BECKY HANSON, RENE REULET,
LINDA GRAY, LAREN FERRELL,
STUART GILLETT, ROBERT PEARSON, GARY REESE,
and BRUCE JOHNSON,

Petitioners-Respondents,

v.

PUBLIC EMPLOYEES RETIREMENT BOARD,

Respondent-Appellant,

1

and

STATE OF OREGON,
CITY OF PORTLAND,
PORTLAND SCHOOL DISTRICT,
CITY OF GRESHAM, LINN COUNTY,
PORTLAND COMMUNITY COLLEGE,
MULTNOMAH COUNTY,
CENTRAL CATHOLIC SCHOOL DISTRICT 13J,
and FOREST GROVE SCHOOL DISTRICT #15,

Intervenors-Appellants.

(CC 060504584; SC S058882)

On certified appeals from the Court of Appeals on appeals from judgments of the Circuit Court for Multnomah County, Henry Kantor, Judge.

Argued and submitted January 6, 2011.

Gregory A. Hartman, Bennett, Hartman, Morris & Kaplan, LLP, Portland, argued the cause for plaintiffs-appellants Michael Arken *et al*. With him on the briefs were Michael J. Morris and Aruna A. Masih.

William F. Gary, Harrang Long Gary Rudnick P.C., Eugene, argued the cause for defendants-respondents City of Portland *et al*. With him on the briefs was Sharon A. Rudnick.

Joseph M. Malkin, Orrick, Herrington & Sutcliffe, LLP, *Pro Hac Vice*, San Francisco, California, argued the cause for respondent-appellant Public Employees Retirement Board. With him on the briefs were Townsend Hyatt and Sarah C. Marriott, *Pro Hac Vice*.

James S. Coon, Swanson, Thomas & Coon, Portland, argued the cause for petitioners-respondents Ruth Robinson *et al*. With him on the briefs was Gene Mechanic.

Joseph M. Malkin, Orrick, Herrington & Sutcliffe, LLP, *Pro Hac Vice*, San Francisco, California filed the briefs for defendant-respondent Public Employees Retirement Board. With him on the briefs were Townsend Hyatt and Sarah C. Marriott, *Pro Hac Vice*.

Jeremy D. Sacks, Stoel Rives LLP, Portland, filed the briefs for defendants-respondents Western Oregon University and University of Oregon. With him on the briefs was Amy Edwards.

William F. Gary, Harrang Long Gary Rudnick P.C., Eugene, filed the briefs for intervenors-appellants City of Portland *et al*. With him on the briefs was Sharon A. Rudnick.

Amy Edwards, Stoel Rives LLP, Portland, filed the briefs for intervenor-appellant State of Oregon. With her on the briefs was Jeremy D. Sacks.

Before De Muniz, Chief Justice, and Durham, Balmer, Kistler, Walters, and Linder, Justices.*

DE MUNIZ, C. J.

The judgment of the circuit court in *Arken, et al. v. City of Portland, et al.*, Case No. 0601-00536, is affirmed. The judgment of the circuit court in *Robinson, et al. v. Public Employees Retirement Board*, Case No. 0605-04584, is reversed, and the case is remanded to the circuit court for further proceedings.

*Landau, J., did not participate in the consideration or decision of this case.

DE MUNIZ, C. J.

These two cases are before this court on certified appeals from the Court of Appeals. ORS 19.405. Both cases involve the Public Employees Retirement Board's (PERB or the Board) revision or reduction of benefits with respect to so-called "Window Retirees."[1] These cases involve the Board's efforts to recoup overpayments of benefits to retirees that were predicated on a 20 percent earnings credit for calendar year 1999 that the Board approved by order in 2000. PERB has sought to recoup these overpayments to the Window Retirees through an overpayment recovery mechanism set out in ORS 238.715.[2] PERB has done so in two steps. First, in an order issued by the Board on January 27, 2006, the Board established a general method for the recovery of overpayments made to PERS members based on the 20 percent crediting order. Subsequently, the Board made individualized recovery determinations based on the individual circumstances of each affected PERS member.[3]

---

[1] The term "Window Retirees" has been used by the parties to this litigation to refer to public employees who are Tier One members of the Public Employees Retirement System (PERS), who retired under the Money Match retirement allowance formula, and who retired with an effective retirement date on or after April 1, 2000, and before April 1, 2004. A Tier One member is a PERS member who joined PERS before January 1, 1996. Money Match refers to one of the three formulas for calculating a PERS member's service retirement allowance. These terms are discussed in more detail below.

[2] The pertinent provisions of ORS 238.715 are set out below, ___ Or at ___ (slip op at 65-66.)

[3] To provide a general understanding of the magnitude of the repayment amounts that would be required of the Window Retirees, PERS staff issued a Benefit Adjustment Letter Draft on February 24, 2006, that set out the effects for a hypothetical "John Doe" window retiree who assumably retired on April 1, 2000, with $132,211.00 in his retirement account (based on the 20 percent earnings credit allocation for 1999). The

1

The *Arken* plaintiffs[4] and the *Robinson* petitioners[5] both filed challenges to

adjustments that would be generated under that hypothetical were tabulated as follows:

Retirement date: April 1, 2000

Recalculated payment start date: September 1, 2006

| | |
|---|---|
| Account balance at retirement (with 20 percent earnings crediting in 1999) | $132,211.00 |
| Recalculated account balance at retirement (11.33 percent earnings crediting in 1999) | $122,700.00 |
| Monthly benefit at retirement (your retirement date was April 1, 2000) | $2,200.00 |
| Recalculated monthly benefit at retirement (11.33 percent earnings crediting in 1999) | $2,042.00 |
| Current monthly benefit, including any cost-of living adjustments (COLAs) made since your retirement date | $2,335.00 |
| Recalculated monthly benefit (starting September 1, 2006). This includes annual COLAs made and COLAs restored by the *Strunk* case through August 1, 2006 | $2,346.00 |

The Benefit Adjustment letter then explained that for this "John Doe" window retiree the amount of overpaid benefits would have been $9,313.00, for which there were two options provided for repayment. This "John Doe" window retiree would then have the option to repay the $9,313.00 in a lump sum, which would result in his monthly benefit amount being adjusted to $2,346.00 beginning September 1, 2006. Alternatively, this "John Doe" window retiree would have the option to repay the overpayment by having his monthly benefit adjusted using the Actuarial Reduction Method which would result in a reduction of the current monthly benefit amount to $2,317.00 (a reduction of $29.00 per month). Under either option, an annual COLA would then be applied to the benefit payment each August 1.

From our review of the record in these proceedings, the consequences projected for this "John Doe" window retiree are consistent with the amounts that were ultimately determined by PERB for individual Window Retirees.

[4] The *Arken* plaintiffs (appellants in this court) are a group of individual

2

PERB's January 7, 2006, Order Adopting Repayment Methods. That order established the methods that PERB intended to use to recover what PERB had determined to be overpayments to the Window Retirees. That order provided in part that earnings on Tier One member regular accounts for 1999 would be recalculated at an earnings rate of 11.33 percent and that benefit payments to Window Retirees who had regular member accounts in 1999 would be adjusted consistently with the recalculated earnings rate. That order relied on PERB's authority to recover overpayments set out in ORS 283.715, and the order provided that the overpayments could be repaid either in a lump sum or by an actuarial reduction of monthly benefits payments. The order further provided that cost of living adjustments (COLAs) would be applied to those recalculated benefit payments

public employees who were Tier One members of PERS who retired under the Money Match retirement allowance formula whose effective date of retirement was on or after April 1, 2000, and before April 1, 2004 -- *i.e.,* Window Retirees. While the *Arken* plaintiffs have not been certified as class representatives for all Window Retirees, the issues raised by their claims appear to apply similarly to the Window Retirees collectively. The *Arken* defendants (respondents in this court) include: defendant Public Employees Retirement Board; state defendants Western Oregon University and the University of Oregon; and, a group of nonstate defendant local government employers comprised of the City of Portland, Portland School District, City of Gresham, Linn County, Portland Community College, Multnomah County, Central School District 13J, and Forest Grove School District #15.

[5] The *Robinson* petitioners (respondents in this court) are a group of individual public employees who serve as class representatives for public employees who were Tier One members of PERS who retired under the Money Match retirement allowance formula whose effective date of retirement was on or after April 1, 2000, and before April 1, 2004 -- *i.e.*, Window Retirees. The *Robinson* respondents (appellants in this court) include: respondent Public Employees Retirement Board; intervenor State of Oregon; and a group of nonstate intervenor local government employers comprised of the City of Portland, Portland School District, City of Gresham, Linn County, Portland Community College, Multnomah County, Central School District 13J, and Forest Grove School District #15.

3

beginning in 1999 and continuing into the future.

Although the trial court did not consolidate these two cases, it determined that the cases raised interrelated issues concerning the effects of PERS legislation enacted in 2003 (the "2003 PERS reform legislation").[6] The trial court therefore decided motions filed in these cases together and issued opinions that were filed in both cases.

The *Arken* plaintiffs raised claims based on four theories, including breach of contract, promissory estoppel, wage claim, and declaratory and injunctive relief under the Administrative Procedures Act (APA). The trial court granted summary judgment in favor of the *Arken* defendants on all four claims.

The *Robinson* petitioners challenged the Board's January 27, 2006, order as an order in other than a contested case under ORS 183.484, alleging that the order violated Oregon Laws 2003, chapter 67, Section 14b(1) (discussed more fully below). The *Robinson* petitioners contended that Section 14b(1) provides the exclusive methods to recover erroneously paid retirement benefits to petitioners. They also alleged that the order violates ORS 238.715 because PERB failed to comply with the terms of that statute. The trial court granted summary judgment in favor of the *Robinson* petitioners on both of their claims for relief.

---

[6] In 2003, the Legislative Assembly amended a number of statutory provisions related to the operation of the PERS system and affecting PERS benefits, including Oregon Laws 2003, chapters 3, 67, 68, and 625. Collectively, these amendments to the PERS statutes are referred to as the "2003 PERS reform legislation." We use that term as a general referent to the efforts of the 2003 Legislative Assembly to effectuate changes to the PERS system, but we cite more specifically to particular enactments when appropriate.

4

For the reasons set out below, we determine that the trial court correctly granted summary judgment to the *Arken* defendants on all four of the claims raised by the *Arken* plaintiffs. We further determine that the trial court erred in granting summary judgment to the *Robinson* petitioners on their claims for relief. Because we conclude that PERB correctly applied ORS 238.715 to recoup overpayments that were made to the Window Retirees based on the 20 percent earnings credit for 1999, we also determine that the trial court erred in denying PERB's cross-motion for summary judgment.

# I. BACKGROUND

Before addressing the specific claims and arguments presented in these cases, we believe it is important to review the factual and legal circumstances that gave rise to the PERB order that is challenged in these proceedings. Oregon has provided its public employees with a retirement plan (PERS) as a contractual benefit of public employment since 1945. PERB administers PERS and acts as trustee for the Public Employment Retirement Fund (PERF or the fund). ORS 238.601; ORS 238.660(1). PERB sets employer contribution rates, adopts actuarial equivalency factors and assumed earnings rates, establishes reserve accounts, and allocates annual earnings to accounts and reserves. ORS 238.225; ORS 238.255; ORS 238.605; ORS 238.607; ORS 238.670; *Strunk v. PERB*, 338 Or 145, 157, 108 P3d 1058 (2005). The Oregon Investment Council (OIC) invests the assets of the fund. Each year, PERB allocates the annual investment earnings of the fund from the previous year to member, employer, and reserve accounts. Every PERS member has a PERS member account, which includes the member's contributions to PERS and earnings that PERB has credited to those contributions.

5

Public employees who joined PERS before January 1, 1996, are commonly denominated as Tier One members. Tier One members are entitled to a guaranteed minimum annual rate of return on their regular member accounts equal to the system's assumed earnings rate. ORS 238.255. The assumed rate is set by the Board based on advice from an actuary. ORS 238.605; ORS 238.670(2). The assumed earnings rate has been 8 percent for all time periods relevant to these cases. On retirement, PERS Tier One members receive a monthly service retirement allowance calculated according to one of three formulas: pension plus annuity (only available to members who contributed to PERS before August 21, 1981), full formula, or Money Match. ORS 238.300. At retirement, a PERS member is entitled to receive a service retirement allowance based on the formula that produces the highest pension amount.

For many retirees, including the retirees involved in this litigation, the Money Match formula results in the highest pension amount. Under the Money Match formula, a member's monthly service retirement allowance is calculated by determining the sum of the actuarial equivalent of the member's account balances at retirement (the annuity component) and then adding a sum in an equal amount that is charged to the employer, *i.e.*, the "match" (the pension component).[7] The resulting service retirement allowance therefore amounts to twice the actuarial equivalent of the member's account balances at retirement.

---

[7] The actuarial equivalent of the member's account balances is determined using mortality information to calculate the monthly service retirement allowance to be paid to the member based upon the remaining life expectancy of the member at the time the member retires.

Member accounts are credited annually as of December 31 of each calendar year. PERB reviews changes in the value of the fund and allocates earnings to various accounts within the fund on an "equal crediting" basis -- *i.e.*, earnings are allocated on the same percentage share to funds in each account. In years in which the earnings on the fund equal or exceed the assumed earnings rate, PERB is statutorily required to "set aside * * * such part of the income as [PERB] may deem advisable, not exceeding seven and one-half percent of the combined total of such income, which moneys so segregated shall remain in the fund and constitute therein a reserve account." ORS 238.670(1) (1999). During the time period relevant to this litigation, ORS 238.255 (1999) also charged PERB with maintaining a "gain-loss" reserve to provide assets to pay member benefits at the assumed earnings rate in years in which annual fund earnings were not sufficient to do so.[8] Finally, PERB also is charged with establishing employer contribution rates to fund the retirement system. ORS 238.225. Employer contribution rates are comprised of the employer's normal cost of the members' service retirement allowances and the amount necessary to amortize any unfunded actuarial liability (UAL). The normal costs component is based on an actuarial estimate of the amount needed to pay service retirement allowances to current members in the future. That amount is then adjusted

---

[8] Substantial statutory modifications to PERS were enacted in 2003 to address fiscal concerns that had emerged. Those modifications are addressed in detail throughout this opinion. The contingency fund provisions set out in ORS 238.670(1) (1999) and the "gain-loss" reserve provisions set out in ORS 238.255 (1999) are significant because they affected the 1999 earnings crediting decision made by PERB that is central to this case. Consequently, we cite here specifically to the 1999 versions of those statutes.

based on the difference between an employers' account balance and the projected future service retirement allowances. If an actuarial surplus exists, the employer contribution rate is adjusted downward. If the employer has a UAL, PERB adds an additional, amortized amount to the employer's normal cost rate.

On March 27, 2000, PERB issued an earnings allocation order crediting Tier One members' regular accounts with 20 percent earnings for the 1999 calendar year. In setting that earnings allocation order, PERB did not fund a contingency reserve and allocated only limited funds to the gain-loss reserve. The City of Eugene and several other public employers timely challenged PERB's 1999 earnings allocation order and also timely challenged their employer contribution rate orders for 1998 and 2000.[9] On July 31, 2001, the trial court granted the public employers' motion for partial summary judgment, holding that PERB had abused its discretion by allocating excessive earnings to member accounts while not allocating funds to the contingency reserve and not adequately funding the gain-loss reserve. *See City of Eugene v. PERB*, 339 Or 113, 118-19, 117 P3d 1001 (2005), *on recons*, 341 Or 120, 137 P3d 1288 (2006) (*City of Eugene I*). The trial court vacated each of the challenged orders and directed PERB to issue new orders consistent with the judgment. *Id*. at 119.[10] PERS's Fiscal Services Division subsequently recalculated the earnings credit for 1999 and concluded that, if PERB had

_____

[9] *City of Eugene v. PERB*, Marion County Circuit Court Case Nos. 99C-12794, 00C-16173, 99C-12838, 99C-20235.

[10] This court ultimately dismissed the appeal of the trial court decision as moot, *City of Eugene I*, 339 Or at 128, and later vacated the trial court decision on mootness grounds as well. *City of Eugene v. PERB*, 341 Or 120, 137 P3d 1288 (2006).

8

properly funded the contingency reserve and the gain-loss reserve, the proper 1999 earnings credit for member accounts would have been 11.33 percent. *Strunk*, 338 Or at 216; *City of Eugene I*, 339 Or at 127.

Before PERB issued a new earnings allocation crediting order for 1999, however, the Legislative Assembly amended the PERS statutes by enacting the 2003 PERS reform legislation. As this court noted in *Strunk*, the PERS reform legislation effectively codified the 11.33 percent figure as the correct 1999 crediting decision. 338 Or at 216-17. In *Strunk v. PERB*, this court also approved the finding of this court's appointed Special Master that the contingency reserve should be funded and that a reasonable funding level for the "gain-loss" reserve called for by ORS 238.255 (1999) was a level that would fund projected Tier One guaranteed earnings credits for a 30-month period, and this court expressly set out and agreed with the Special Master's determinations as follows:

> "'In 1999, the fund earned approximately $7.5 billion, or 24.89 percent of its value. [PERB credited 20 percent to Tier One regular accounts for that year.] PERB allocated approximately $1.3 billion to the gain-loss reserve, which left it funded at approximately 72 percent of [its] new 30-month goal. After PERB allocated 1999 earnings, the gain-loss reserve had a positive balance of $4.744 billion.
>
> "'If PERB had fully funded the contingency reserve for 1999 by crediting 7.5 percent of the fund's earnings as authorized by ORS 238.670(1) and, if PERB had fully funded the gain-loss reserve according to its 30-month goal, approximately 11.33 percent would have been available for crediting to Tier One accounts.'"

*Strunk*, 338 Or at 214-15 (alterations in original; footnote omitted).

At the time that the legislature enacted the PERS reform legislation, the

court challenges to PERB's 1999 earnings allocation crediting order in the *City of Eugene* litigation meant that the 1999 crediting decision was potentially subject to reversal. *Id.* at 217. As part of the PERS reform legislation, the legislature enacted provisions addressed directly to the Window Retirees in Oregon Laws 2003, chapter 67, section 10, *as amended by* Oregon Laws 2003, chapter 625, section 13 (Section 10),[11] which provided, in pertinent part:

"(1) Notwithstanding ORS 238.360, cost of living increases for a service retirement allowance that is payable to or on account of members described in subsection (5) of this section may be made only as provided by this section.

"(2) The Public Employees Retirement Board shall calculate a revised service retirement allowance for a service retirement allowance that is payable to members described in subsection (5) of this section. The revised service retirement allowance shall be calculated as follows:

"(a) The board shall establish a member account balance for the member as of the member's effective date of retirement, determined as though the regular member account for the member had been credited with 11.33 percent earnings for calendar year 1999.

"(b) The board shall calculate a service retirement allowance for the member as of the member's effective date of retirement using the member account balance established under paragraph (a) of this subsection. The board shall make the calculation under ORS 238.300, section 4, chapter 68, Oregon Laws 2003, and such other provisions of this chapter as may be applicable to the calculation of the service retirement allowance of the member or as may provide for increases or decreases in the service retirement allowance of the member.

"* * * * *

"(d) The board shall adjust the revised service retirement allowance calculated under paragraph (b) or (c) of this subsection for each calendar year after the member's effective date of retirement based on the cost of

---

[11] We refer to this statutory provision as Section 10.

10

living adjustment provided for in ORS 238.360.

"(3)  The board shall calculate a fixed service retirement allowance for members described in subsection (5) of this section.  The fixed service retirement allowance shall be the amount that is payable to or on account of the member on July 1, 2003, or on the member's effective date of retirement, whichever is later.  The fixed service retirement allowance may not be adjusted under ORS 238.360.

"(4)  The service retirement allowance payable to or on account of members described in subsection (5) of this section shall be the greater of the revised service retirement allowance calculated under subsection (2) of this section or the fixed service retirement allowance calculated under subsection (3) of this section.

"(5)  The provisions of this section apply to members who:

"(a)  Established membership in the Public Employees Retirement System before January 1, 1996, as described in ORS 238.430;

"(b)  Receive a service retirement allowance calculated under ORS 238.300 (2)(b)(A); and

"(c)  Have an effective date of retirement that is on or after April 1, 2000, and before April 1, 2004."

As part of the PERS reform legislation, the legislature also enacted Oregon Laws 2003, chapter 67, section 14b, *as amended by* Oregon Laws 2003, chapter 625, section 31 (Section 14b),[12] which provided:

"(1)  If the Public Employees Retirement Board is required to correct one or more of the erroneous benefit calculation methods identified in City of Eugene et al. v. State of Oregon, Case Nos. 99C-12794, 00C-16173, 99C-12838 and 99C-20235, the board shall recover the cost of benefits erroneously paid to retired members as a result of those erroneous benefit calculations by one or both of the following methods:

"(a)  The board may withhold cost of living increases under ORS 238.360 from a retired member whose benefit is greater than the correctly calculated benefit of the member until such time as the member's benefit is

---

[12]  We refer to this statutory provision as Section 14b.

11

equal to the correctly calculated benefit.

"(b)  The board may treat all or part of the present value of the benefits erroneously paid and payable to retired members as a result of the erroneous benefit calculations as an administrative expense of the Public Employees Retirement System, to be paid exclusively from future income of the Public Employees Retirement Fund, and to be amortized over an actuarially reasonable period not to exceed 15 years.

"(2)  In no event may the cost of erroneous benefit calculation methods identified in City of Eugene et al. v. State of Oregon be considered an employer liability or charged to employers through employer contributions.

"(3)  Nothing in this section creates any contract right in any member of the Public Employees Retirement system."

These two statutory provisions constitute the focal points of the litigation in these cases; we discuss them in greater detail below.

After the legislature enacted the PERS reform legislation, PERB and the employers involved in the *City of Eugene* litigation entered into a settlement agreement that provided, in part:

"[E]xcept in the event of a supervening change in law (such as by a legislative enactment or further court order):

"* * * * *

"1.3   The new 1999 earnings allocation order * * * will provide that the appropriate earnings allocation to Tier [One] regular member accounts is 11.33 [percent], that 7.5 [percent] of the 1999 earnings should have been allocated to the contingency reserve established by ORS 238.670(1) and that the gain-loss reserve created by ORS 238.670(3) should have been funded to the full extent of the former PERB's policy to maintain a gain-loss reserve sufficient to credit the assumed interest rate to Tier [One] regular member accounts during a period of 30 months of 0 [percent] earnings."

Following settlement of the *City of Eugene* litigation, PERB entered a revised earnings

crediting order setting the 1999 earnings credit allocation for Tier One regular member accounts at 11.33 percent pending the outcome of the then still pending litigation challenges to the 2003 PERS reform legislation.[13]

On March 8, 2005, this court issued its opinion in *Strunk v. PERB* upholding the constitutionality of much of the PERS reform legislation. In *Strunk*, this court did determine, however, that Tier One PERS members have a statutory contract right to annual COLAs on their regular member accounts. 338 Or at 221-22. This court, therefore, invalidated the COLA freeze mechanism that the legislature had included as a part of its attempt to recoup what it deemed to be overpayments to the affected members' regular accounts caused by the erroneous 20 percent earnings allocation determination that had originally been made by PERB for 1999. *Id*. at 225.

On August 11, 2005, this court decided *City of Eugene I,* concluding that the 2003 PERS reform legislation had effectively codified 11.33 percent as the legally correct earnings credit allocation for 1999, thus affirming, legislatively, the trial court ruling in *City of Eugene*. In dismissing the *City of Eugene* case as moot, this court noted that PERB had already issued a revised 1999 earnings credit allocation order on April 12, 2004, which superseded the original 20 percent earnings allocation determination and replaced it with the 11.33 percent earnings allocation determination.

Finally, on January 27, 2006, PERB issued its "Order Adopting Repayment

---

[13] Individual PERS members who had intervened in the *City of Eugene* litigation did not agree to the settlement and continued with an appeal; the appeal, however, was ultimately dismissed by this court as moot in light of the 2003 PERS reform legislation. *See* ___ Or at ___ n 10 (slip op at 8 n 10).

13

Methods," which is the order challenged in these consolidated cases. In that order, PERB established the methods that it intended to use to recover what PERB determined to be overpayments made to Window Retirees based on the erroneous 20 percent earnings allocation determination that was temporarily in effect when the Window Retirees retired. The PERB Order Adopting Repayment Methods provides, in pertinent part:

> "This matter came before the Board at its regularly scheduled meeting on January 27, 2006. As a result of Oregon Supreme Court decisions in *Strunk v. PERB*, 338 Or 145, 108 P3d 1058 (2005), and *City of Eugene v. PERB*, 339 Or 113, 117 P3d 1001 (2005), and the settlement agreement between the parties in the latter case, the Board previously determined that the earnings on Tier One member regular accounts for 1999 should be reallocated at an earnings rate of 11.33 percent, instead of the 20 percent rate that originally was used. That reallocation, together with the effect of eliminating the so-called 'COLA freeze' as required by *Strunk*, results in a recalculation of benefit payments made to persons who had Tier One member regular accounts that received earnings crediting for 1999. This recalculation will affect Tier One members who retired on or after April 1, 2000, and before April 1, 2004, other persons who received or are receiving benefits based on those 1999 Tier One account balances, and former members or beneficiaries who withdrew their accounts prior to the earnings reallocation (referred to collectively as 'recipients' hereafter). These recipients have received benefits in excess of the amounts they were entitled to under ORS chapter 238.

> "ORS 238.715 requires the Board to collect amounts paid in excess of the benefit amounts recipient is entitled to under ORS chapter 238."

The challenged order also provides for various ways in which the amounts determined by PERB to be "overpayments" could be repaid, including repaying the "overpayments" in a lump sum or, if the retiree is receiving monthly benefits, repaying the "overpayments" by actuarial reduction of their monthly payment pursuant to ORS 238.715.[14]

---

[14] The express terms of PERB's order addressed to the repayment options are set out at ___ Or at ___ (slip op at 67).

With that historical factual and legal background in mind, we turn to the issues and arguments involved in the claims asserted by the parties in these cases. We first address the issues presented in the *Arken* case.

## II. *ARKEN*

A. *Breach of Contract Claim*

1. *Reach and Effect of Strunk Decision*

As a threshold matter, the *Arken* plaintiffs contend that this court in *Strunk* effectively determined both that the Window Retirees are entitled to receive retirement benefits based on the erroneous 20 percent earnings credit allocation initially made by PERB for calendar year 1999 and that the Window Retirees are also entitled to receive annual COLA increases on those benefits. The *Arken* plaintiffs base that claim on their reading of certain passages of this court's decision in *Strunk*. We disagree.

The *Arken* plaintiffs begin by noting that this court in *Strunk* stated that the "fixed service retirement allowance" called for by Section 10 of the 2003 PERS reform legislation "*itself* represents a *determined allowance* -- that is, an allowance expressly determined by the legislature." *Strunk*, 338 Or at 223 (emphasis in original). The *Arken* plaintiffs then rely on the immediately following discussion in *Strunk*, in which this court noted:

> "In light of that legislative determination, the 'fixed' service retirement allowance cannot be said to transfer to the affected member any funds to which the member (again in the legislature's determination) was not entitled. As such, the 'fixed' service retirement allowance falls within the scope of the promise set out in ORS 238.360(1) (2001) -- that is, that PERB annually apply a COLA to each affected member's allowance (in years in which the CPI warrants such a COLA) -- because the allowance represents

15

funds that the member, by legislative determination, is 'entitled to receive.'" 338 Or at 223. The *Arken* plaintiffs contend that this discussion constitutes a determination by this court that the PERS reform legislation constituted an explicit statutory promise to Window Retirees that they would receive the "fixed service retirement allowance" (based upon the initial PERB earnings crediting allocation of 20 percent for calendar year 1999) and receive COLA increases on that retirement allowance as well for as long as the Window Retirees received retirement benefits.

It is clear, however, that the Legislative Assembly did not make such a statutory promise. The 2003 PERS reform legislation provided that the original service retirement allowance for the Window Retirees should be recalculated in one of two ways: a "revised retirement service allowance" and a "fixed retirement service allowance." And, as this court expressly noted in *Strunk*, those two service retirement allowance calculations were intended by the legislature to be designed to recoup what the legislature "deemed to be overpayments to the affected members' regular accounts in 1999." *Id.* at 220. The "fixed" allowance retained the 20 percent earnings credit for 1999, but eliminated COLAs until a member's retirement benefit based on the "fixed" allowance was surpassed by that based on the "revised" allowance. The "revised" allowance reduced the 1999 earnings credit to 11.33 percent, but continued to provide COLAs.

In Section 10, the legislature clearly and expressly tied the availability of the "fixed service retirement allowance" to the COLA freeze that it intended to use as an overpayment recoupment mechanism. Consequently, we conclude that the only reasonable interpretation of that part of the 2003 PERS reform legislation is that, in

16

enacting Section 10, the legislature intended only that the Window Retirees receive retirement benefits based on the 20 percent earnings crediting decision for a "short" period of time -- *i.e.*, until the "revised service retirement allowance" (based upon the 11.33 percent earnings crediting allocation, with COLAs) caught up. Thus, in enacting the 2003 PERS reform legislation, the legislature did not promise the Window Retirees long-term retirement benefits based upon the 20 percent earnings crediting allocation and COLAs.

The *Arken* plaintiffs read this court's decision too broadly. This court's discussion of the "fixed service retirement allowance" in *Strunk* must be understood in the context of the precise issue that was before the court in *Strunk*.

In *Strunk*, this court addressed the "fixed service retirement allowance" only in the context of that allowance coupled with the suspensions of COLAs as the legislature's choice of a method of recouping overpayments. This court's discussion about the "fixed service retirement allowance" constituting an allowance that the legislature had determined the members were entitled to receive can only be read to reach as far as whether the "fixed service retirement allowance" was a determined allowance to which a COLA must attach under the terms of ORS 238.360. Whether the legislature intended to and did promise the Window Retirees long-term retirement benefits based upon the 20 percent earnings crediting allocation augmented by COLAs was not before this court in *Strunk*.

Indeed, this court expressly noted the limited reach of its holding in *Strunk*. For example, this court clarified:

17

"Put another way, the legislature took what it deemed to be restorative action, but used as the mechanism for doing so an adjustment that implicated the COLA provision of the PERS contract. Our conclusion that that particular legislative action amounted to a breach of the PERS contract, however, implies nothing about PERB's -- or, for that matter, the legislature's -- authority to recover amounts determined to have been paid from the fund in error."

338 Or at 224 n 58. In addition, in concluding the discussion about the COLA suspension mechanism employed by the legislature, this court specifically noted that the effect of the court's decision "is that petitioners will be returned -- *at least for the time being* -- to the same position in which they would have been if the legislature had not enacted the COLA suspension." *Id.* at 225 (emphasis added; footnote omitted). Those caveats negate any suggestion that this court's decision in *Strunk* can or should be interpreted to have the far-reaching effect that the *Arken* plaintiffs advocate, and we decline to extend that decision beyond the specific issues addressed there. Thus, we find no merit in the first argument presented by the *Arken* plaintiffs.

The *Arken* plaintiffs further contend, however, that the remedy that this court established in *Strunk* effectively means that the statutory text of Section 10 leaves no room for PERB to apply ORS 238.715 to recover any purported overpayments to Window Retirees based upon the erroneous 20 percent earnings credit allocation for 1999. The *Arken* plaintiffs base their arguments on the text of Section 10, the remedy they understand this court provided in the *Strunk* case, and the legislative history that they provide concerning the 2003 PERS reform legislation.

The *Arken* plaintiffs note that this court in *Strunk* stated:

"under what we deem to be unique circumstances, we conclude that the

18

prudent dispositional action is to invalidate the offending statutory wording. Accordingly, we declare that part of Oregon Laws 2003, chapter 67, section 10(3), that provides, '[t]he fixed service retirement allowance may not be adjusted under ORS 238.360,' to be void."

338 Or at 225. Based upon that statement, the *Arken* plaintiffs contend that the terms of Section 10 must be read to provide the Window Retirees with a statutory promise enacted by the legislature to provide retirement benefits based upon the original 20 percent earnings credit allocation for calendar year 1999 with COLAs attached. The *Arken* plaintiffs contend that the dispositional language in *Strunk* set out above had the legal effect of stripping out the last sentence of Section 10(3) and leaving the remainder of the legislatively enacted provisions in place for all purposes -- including establishing an entitlement for Window Retirees to long-term retirement benefits calculated on a 20 percent earnings credit allocation for 1999 with COLAs attached.

That argument, however, ignores a number of important contextual matters. First, the argument takes the statement from *Strunk* quoted above out of context and views it in isolation, which leads to an overly broad understanding of the effect this court intended. As we previously noted, the very next sentence of this court's opinion in *Strunk* states that the effect of the court's action "is that petitioners will be returned -- *at least for the time being* -- to the same position in which they would have been if the legislature had not enacted the COLA suspension." *Id.* at 225 (emphasis added). Those emphasized terms demonstrate that this court's decision in *Strunk* did not establish the entitlement for Window Retirees that the *Arken* plaintiffs urge.

That conclusion is further buttressed by the explicit caveat set out in *Strunk*

19

noted above -- *viz.*, that the court's determination that the COLA suspension mechanism the legislature used to recover overpayments to the Window Retirees in Section 10 breached the PERS contract "implies nothing about PERB's -- or for that matter, the legislature's -- authority to recover amounts determined to have been paid from the fund in error." *Id.* at 224 n 58. The position urged by the *Arken* plaintiffs now is to give this court's decision in *Strunk* precisely the effect that this court stated it did not intend. In summary, our decision in *Strunk* did not have the effect the *Arken* plaintiffs now urge, and we do not agree that the Window Retirees have a statutory contract right based on Section 10 to the retirement benefits claimed by the *Arken* plaintiffs. Once that mistaken view is corrected, as we determine it must be, the proper analysis of Section 10 applies as follows.

2. *Whether the 2003 PERS Reform Legislation means ORS 238.715 cannot be applied to Window Retirees*

In interpreting the terms of a statute, the court will examine the text and context of the statute and consider the legislative history of the statute where that legislative history is useful in determining the meaning of the terms used. *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009). However, it is also important to note that the goal is to discern what the legislature that enacted the statute in question had in mind at the time the legislature enacted the statue at issue. *See, e.g., Holcomb v. Sunderland,* 321 Or 99, 105, 894 P2d 457 (1995) ("The proper inquiry focuses on what the legislature intended at the time of enactment and discounts later events."). Furthermore, as we noted in *Strunk*, it is particularly important to ascertain the intent of

the correct legislature when analyzing statutes to determine whether they constitute a statutory contract, because the fundamental purpose behind such contracts is to bind future legislative action. *Strunk*, 338 Or at 189.

Here, the terms of Section 10 manifest the 2003 legislature's intent to restrict the retirement benefits that the Window Retirees would otherwise receive based on PERB's erroneous 20 percent earnings credit allocation for calendar year 1999. That intent is clear in the legislature's express coupling of the "fixed service retirement allowance" established in Section 10(3) with the COLA suspension included in that same subsection. Thus, the express terms of Section 10(3) show that the legislature that enacted it intended it as a limitation on the retirement benefits that Window Retirees should receive. *See Gaines*, 346 Or at 171 (words used by legislature to give expression to its wishes are best evidence of legislative intent).[15]

Context and the legislative history of Section 10 support that determination as well. First, it is significant that Section 10(3) is embedded in a statute that is addressed, for the most part, to establishing the terms under which cost-of-living increases are to be provided for service retirement allowances for Window Retirees. Section 10(1) states:

> "Notwithstanding ORS 238.360, cost of living increases for a service retirement allowance that is payable to or on account of members described

---

[15] The fact that this court subsequently struck down the COLA suspension mechanism in *Strunk* does not affect our analysis of the legislature's intent in enacting the statute because the relevant inquiry is addressed to the intent of the legislature at the time that it enacted the statute in question. *See Holcomb*, 321 Or at 105 (noting proper inquiry is to discern purpose legislature had in mind at time statute enacted).

in subsection (5) of this section may be made only as provided by this section."

And Section 10(5) limits application of the section to those Tier One members of PERS who have an effective date of retirement between April 1, 2000 and April 1, 2004 -- *i.e*, the Window Retirees. Reading Section 10 as a whole, the goal of those statutory provisions was to establish a means by which the cost-of-living adjustment would be used to reduce the overall payout of retirement benefits to Window Retirees from what they otherwise would receive by excluding those retirement benefits from the normal application of COLAs under ORS 238.360. Those contextual provisions demonstrate that the terms of Section 10(2) and Section 10(3) were intended to establish a means of limiting the retirement benefits of Window Retirees, either by reducing the earnings credit allocation for calendar year 1999 to 11.33 percent and allowing COLAs to continue to apply to the reduced benefit amounts under ORS 238.360 (Section 10(2)), or by suspending COLAs on retirement service allowances calculated on the 20 percent earnings credit allocation (Section 10(3)). Those contextual clues reinforce our determination that Section 10(3) was not intended to and does not establish an entitlement for Window Retirees to receive long-term retirement benefits based on a 20 percent earnings credit for calendar year 1999, including annual COLAs.

Instead, Section 10 was intended to reduce retirement benefits that Window Retirees receive in order to "recoup" some of the retirement benefits that otherwise would be paid to them based on the 20 percent earnings credit allocation that the 2003 legislature had determined was excessive. As noted above, PERB's original 20 percent

22

earnings credit allocation for calendar year 1999 was challenged by several public employers in the *City of Eugene* litigation. In that litigation, the trial court determined that PERB had abused its discretion by allocating excessive earnings to member accounts while not allocating any funds to the contingency reserve and not adequately funding the gain-loss reserve. In light of that trial court ruling, PERS recalculated the earnings credit for 1999 and concluded that, if the contingency reserve and gain-loss reserve had been properly funded, the proper 1999 earnings credit allocation would have been 11.33 percent. The 2003 Legislative Assembly enacted Section 10 in that context as part of the 2003 PERS reform legislation. And in the preamble to HB 2003 (which became Oregon Laws 2003, chapter 67), the Legislative Assembly expressly declared its view that "some retirees are receiving benefits that exceed the benefits provided by law," thus indicating that the goal of the legislation was to remedy the effects of prior actions by PERB. Indeed, in that preamble, the legislature explicitly referred to the *City of Eugene* litigation, stating that the legislation was intended to address the trial court's finding that PERB had abused its discretion "in failing to set aside adequate statutorily mandated reserves out of investment income while crediting imprudently large amounts of investment income to member accounts[.]"

In light of the text, context, and this legislative history, we conclude that the 2003 Legislative Assembly did not intend Section 10(3) to establish an entitlement for Window Retirees to receive retirement benefits based upon the 20 percent earnings credit allocation originally made by PERB for calendar year 1999. That conclusion is particularly significant in the circumstances presented here, because the terms of the

23

statutory PERS contract are a matter of legislative intent and only statutory terms that "unambiguously evince[] an underlying promissory, contractual legislative intent" become a part of the statutory PERS contract. *Hughes v. State of Oregon*, 314 Or 1, 26, 838 P2d 1018 (1992). The terms of Section 10 do not evince any such promissory intent on the legislature's behalf.

Although the foregoing addresses the *Arken* plaintiffs primary arguments under their first claim for relief, they also posit that, in enacting the PERS reform legislation, the Legislative Assembly intended for that legislation to constitute the only available methods for PERB to recover any overpayments to the Window Retirees. We now turn to that argument.

The *Arken* plaintiffs note that the PERS reform legislation was built around general principles that had been enunciated by Governor Kulongoski in "The Governor's Standards for Public Pension Reform," which was provided to the House Committee on PERS on April 17, 2003. The *Arken* plaintiffs assert that those general principles govern how the PERS reform legislation should be interpreted and support their contention that the reform legislation did not leave open any option for PERB to recover any overpayments to the Window Retirees under ORS 238.715.

The Governor's Standards for Public Pension Reform articulated two principles of primary import on which the *Arken* plaintiffs rely. The Governor urged that PERS reform should protect retirees by not reducing the benefits of people who had already retired and retaining what had already accrued in member accounts. Although those goals may have been important parts of the discussion by interested parties

24

involved in the push for the 2003 PERS reform legislation, such generalized concepts do not override the actual terms of the statutes enacted, the specific circumstances surrounding enactment of the statute, or the more significant statements of the Legislative Assembly itself indicating the legislature's intent in enacting the statutory provisions at issue.

As the *Arken* defendants note, the express terms of the PERS reform legislation did not address the continuing vitality of ORS 238.715. The legislature certainly was aware of PERB's long-standing authority under ORS 238.715 to recover overpayments made to PERS members. The legislature did not, however, include in the 2003 PERS reform legislation any provisions that directly address or directly negate PERB's authority under that statute. This court has noted that repeal of a statutory provision by mere implication is disfavored, *see, e.g., State v. Langdon*, 330 Or 72, 81, 999 P2d 1127 (2000) (repeal of statute by implication not favored and must be established by plain, unavoidable, and irreconcilable repugnancy), and we discern no reason in this circumstance to depart from that general rule.

Furthermore, while it can be problematic to rely on a legislative omission, the enactment history of HB 2003 indicates that the legislature affirmatively chose to leave the authority provided by ORS 238.715 resident in PERB. As introduced in the 2003 legislative session, HB 2003 expressly provided that the COLA freeze approach was "in lieu of, and not in addition to, any action of the board taken pursuant to ORS 238.715." Those provisions were removed from the legislation during its consideration by the Legislative Assembly, however, and were not included in the enrolled version of

25

HB 2003 that was enacted by the legislature. We agree with the *Arken* defendants that this enactment history adds additional support to the conclusion that the 2003 PERS reform legislation did not directly or indirectly eliminate the availability of the ORS 238.715 overpayment recovery authority.

Finally, this result is consistent with the overall goals of the 2003 PERS reform legislation. As noted above, the legislature articulated in the preamble to HB 2003 that the legislation was intended to remedy the effects of PERB's prior actions, including the erroneous crediting of large amounts of investment income to member accounts that had been identified in the *City of Eugene* litigation. In light of the foregoing, we conclude that the Legislative Assembly did not intend to eliminate *sub silentio* the authority of PERB to apply the overpayment recovery provisions of ORS 238.715 to the Window Retirees.

In sum, we conclude that the *Arken* plaintiffs' arguments that the 2003 PERS reform legislation constituted a statutory promise that the Window Retirees are entitled to receive retirement benefits based on the 20 percent earnings credit allocation for 1999, including COLAs, are not well taken. And we further conclude that the 2003 PERS reform legislation did not eliminate PERB's authority under ORS 238.715 to seek to recover overpayments to PERS members, including the Window Retirees. We therefore affirm the trial court's grant of summary judgment against the *Arken* plaintiffs on their breach of contract claim.

B. *Promissory Estoppel*

We next consider the *Arken* plaintiffs' argument that PERB should be

precluded from applying ORS 238.715 to the Window Retirees based on the doctrine of promissory estoppel. The framework for plaintiffs' promissory estoppel argument is essentially that: (1) representations were made in notices to Window Retirees that future benefits would be based on the 20 percent earnings rate for 1999; (2) PERB reasonably expected Window Retirees to rely on these representations in making retirement decisions; and (3) Window Retirees did reasonably rely on these representations in making retirement decisions.

Although the *Arken* plaintiffs' claims follow the general contours of Oregon promissory estoppel law,[16] promissory estoppel against a governmental entity, however, can be applied only in limited circumstances. For example, in *Wiggins v. Barrett & Associates, Inc.*, 295 Or 679, 669 P2d 1132 (1983), this court set out the specific circumstances that supported application of promissory estoppel in that case. The court stated:

"(2) Can a municipality be bound by the promise of its agent acting

---

[16] In *Coos County v. State of Oregon,* 303 Or 173, 734 P2d 1348 (1987), this court described the essential elements of promissory estoppel in the following terms:

"The elements of equitable estoppel in Oregon were set out by this court in *Oregon v. Portland Gen. Elec. Co.,* 52 Or 502, 528, 95 P 722 (1908):

"'To constitute estoppel by conduct there must (1) be a false representation; (2) it must be made with knowledge of the facts; (3) the other party must have been ignorant of the truth; (4) it must have been made with the intention that it should be acted upon by the other party; (5) the other party must have been induced to act upon it: Bigelow, *Estoppel* (5 ed), 569, 570.'"

303 Or at 180-81.

beyond the scope of his actual authority?  We hold that the municipality may be bound if (a) the municipality clothes the agent with apparent authority, (b) the promise is one which the municipality could lawfully make and perform, (c) there is no statute, charter, ordinance, administrative rule, or public record that puts the agent's act beyond his authority, (d) the person asserting the authority has no reason to know of the want of actual authority, and (e) the municipality has accepted and retained the benefit received by the municipality in return for the promise."

*Id.* at 683.  Although not every one of the circumstances noted in *Wiggins* will necessarily be required in every case to conclude that promissory estoppel may appropriately be applied to a governmental entity, a comparison of the circumstances present here to the factors identified in *Wiggins* reveals numerous reasons why promissory estoppel is inapplicable here.

First, as we have stated earlier, whether a promise is a part of the PERS statutory contract depends on the precise terms of the statutory provisions enacted by the Legislative Assembly.  The fact that the representations on which plaintiffs rely were made by PERB, and not the Legislative Assembly, is telling.  Indeed, as this court previously noted in *Strunk*, the legislature has not clothed PERB with apparent authority to determine the parameters of the PERS statutory contract -- rather, PERS is a statutory contract and there is "no Oregon statute indicating that the legislature intended to permit PERB or any other entity as a general matter to set or alter any terms of the PERS statutory contract."  338 Or at 175 (footnote omitted).

Moreover, given our determination in *Strunk* that, in enacting Section 10, the Legislative Assembly "effectively codif[ied] the 11.33 percent figure as the correct 1999 crediting decision[,]" 338 Or at 216 (footnote omitted), the purported promise by

28

PERB to calculate their retirement benefits on a 20 percent crediting allowance for 1999 is a promise that PERB could not lawfully make. In other words, we have already determined that there are statutory provisions that put such a promise beyond PERB's authority to make.

Finally, the Window Retirees had reason to know that PERB lacked the authority to make the alleged representations on which they rely. PERB's 1999 earnings crediting decision was timely challenged by the public employers involved in the *City of Eugene* litigation discussed earlier. As we stated in *Strunk*, "[a]s a result of the court challenges to PERB's 1999 crediting decision, that decision was potentially subject to reversal at the time that the legislature enacted Oregon Laws 2003, chapter 67, sections 9 and 10, *as amended by* Oregon Laws 2003, chapter 625, section 13." *Strunk*, 338 Or at 216-17. And, as the trial court noted, although the individual Window Retirees may not each have had personal knowledge about the vagaries of administrative and appellate court case law and procedure, they are charged with notice that the 1999 earnings crediting decision was subject to judicial review under ORS 183.484 and subject to potential reversal or change. As defendant PERB asserts, "Given that the 1999 earnings crediting decision was not yet final and was the subject of highly-publicized litigation, plaintiffs could not have reasonably relied on it." Similarly, this court has previously stated that the existence of a law in the public domain makes reliance on a contrary representation patently unreasonable, precluding estoppel. *See Committee in Opposition v. Oregon Emergency Correc.*, 309 Or 678, 686, 792 P2d 1203 (1990) (so stating).

We thus conclude that the trial court correctly granted summary judgment

against the *Arken* plaintiffs' second count of their contract claim for relief based on promissory estoppel.

C.      *Wage Claim*

In their second claim for relief, the *Arken* plaintiffs assert that retirement benefits come within the scope of "wages" under ORS 652.610 and that the *Arken* defendants violated the wage claim statutes by not timely paying Window Retirees the COLA increases on their retirement benefits that they contend were due based on this court's decision in *Strunk*.  The *Arken* plaintiffs cite *Kantor v. Boise Cascade Corp.*, 75 Or App 698, 708 P2d 356 (1985), *rev den*, 300 Or 506 (1986) -- which in turn cites this court's decision in *State ex rel Nilsen v. Ore. Motor Ass'n*, 248 Or 133, 432 P2d 512 (1967) --  and *Allen v. County of Jackson County*, 340 Or 146, 129 P3d 694 (2006), for the proposition that the term "wages" has been broadly construed to include pension benefits.  The *Arken* plaintiffs further contend that PERB acts as the agent for the Window Retirees' actual employers for purposes of pension benefits, and that the public employers are ultimately liable for the cost of providing the benefits and wages that they allege they are due, citing *Stovall v. State of Oregon*, 324 Or 92, 922 P2d 646 (1996).

The *Arken* defendants generally take issue with whether PERS pension payments come within the scope of the wage claim statutes, asserting that the issues involved here do not revolve around employer actions in withholding contributions to a pension plan or in refusing to pay a private pension amount, which were the circumstances involved in *Kantor*, *SER Nilsen*, and *Allen*.  The public-employer *Arken* defendants further contend that, once employees retire, their former employers have no

30

control over the issuance of retirement benefits checks, and when, as here, an employer has done nothing to cause an incorrect payment, the wage claim statutes should not be interpreted to apply to the employer. Defendant PERB, for its part, further contends that it is not an employer to whom the wage claim statutes apply.

It is unnecessary to address many of the issues raised by the parties under this claim because the major premise underlying the *Arken* plaintiffs' wage claim is incorrect. The *Arken* plaintiffs base their wage claim on their assertion that PERB did not timely pay them COLA increases on their retirement benefits, as they contend this court's decision in *Strunk* required.

From our review of the record -- and none of the parties to this litigation contends otherwise -- it appears that when individual Window Retirees have actually retired they would have begun receiving retirement benefits under the 2003 PERS reform legislation based either on their "revised service retirement allowance" or their "fixed service retirement allowance," whichever was the larger amount. *See* Section 10(4). If they received retirement benefits based on a "revised service retirement allowance," they would have begun receiving benefits based upon an earnings credit allocation of 11.33 percent for calendar year 1999, and they would also have received COLA increases on those benefits under Section 10(2). Consequently, no Window Retirees receiving retirement benefits based on a "revised service retirement allowance" would have been deprived of any COLA payments to which they were entitled, and they would have no basis to assert any wage claim based on an assertion that they had not received COLA payments. Indeed, we do not understand the *Arken* plaintiffs to assert that any Window

31

Retiree who has received retirement benefits under the "revised service retirement allowance" provisions of Section 10 (if, in fact, there were any Window Retirees who have done so) has any basis for a wage claim.

Furthermore, Window Retirees who retired and began receiving retirement benefits under a "fixed service retirement allowance" under Section 10(3) would have begun receiving benefits based on the erroneous earnings credit allocation of 20 percent for calendar year 1999. They would have received retirement benefits based on that 20 percent earnings credit allocation for calendar year 1999 from the date of their retirement until the time that PERB both issued the Order Adopting Repayment Methods on January 27, 2006 (the order that is challenged in this case) and applied the repayment methods set out in that order to each of those Window Retirees through an individual determination. As we have discussed at length, we have determined that the Window Retirees were not entitled to receive long-term retirement benefits based on a 20 percent earnings credit allocation for 1999, including COLAs. This court's decision in *Strunk* determined only that the legislature's choice to eliminate COLAs on the "fixed service retirement allowance" was not a method available for the legislature to recoup overpayments. Consequently, the Window Retirees who have received retirement benefits based on a "fixed service retirement allowance" calculation have received retirement benefits for some period of time based on the erroneous 20 percent earnings credit allocation for calendar year 1999 -- and such payments contain an amount which constitutes an overpayment of the retirement benefits to which they are actually entitled.

32

That is what PERB determined in the order that is challenged in this case[17] and the record shows that PERB has applied that order in a manner that is consistent with that determination.  The individualized determination letters that PERB has issued to Window Retirees, at least as shown by those contained in the record of this proceeding, show how PERB has calculated overpayments to Window Retirees:

> "After making the *Strunk* and *Eugene* recalculations, we determined that you have been overpaid benefits.  We calculated the amount of overpayments as follows:

> "1.  We totaled the benefits that have been and will be paid to you from your retirement date * * * to the recalculation date * * *.

> "2.  We then totaled the monthly benefits you should have received after the *Strunk* and *Eugene* recalculations, including Cost of Living Adjustments (COLAs), from your retirement date * * * to the recalculation date * * *.

> "3.  The difference between what you were paid (number 1, above)

---

[17]  PERB's January 27, 2006, order states:

"As a result of Oregon Supreme Court decisions in *Strunk v. PERB*, 338 Or 145, 108 P3d 1058 (2005) and *City of Eugene v. PERB*, 339 Or 113, 117 P3d 1001 (2005), and the settlement agreement between the parties in the latter case, the Board previously determined that the earnings on Tier One member regular accounts for 1999 should be reallocated at an earnings rate of 11.33 percent, instead of the 20 percent rate that originally was used. That reallocation, together with the effect of eliminating the so-called 'COLA freeze' as required by *Strunk*,  results in a recalculation of benefit payments made to persons who had Tier One member regular accounts that received earnings crediting for 1999.  This recalculation will affect Tier One members who retired on or after April 1, 2000, and before April 1, 2004, other persons who received or are receiving benefits based on those 1999 Tier One account balances, and former members or beneficiaries who withdrew their accounts prior to the earnings reallocation (referred to collectively as 'recipients' hereafter).  These recipients have received benefits in excess of the amounts they were entitled to under ORS chapter 238."

and what you should have been paid (number 2, above) is the overpayment amount."

Thus, PERB has recalculated retirement benefits for Window Retirees by revising the 1999 earnings credit allocation from 20 percent to 11.33 percent as required by the 2003 PERS reform legislation. PERB has also given those Window Retirees credit for COLA payments on the recalculated retirement benefits from the date that the Window Retirees retired through the recalculation date. PERB thus has paid the Window Retirees all the retirement benefits to which they are entitled under the PERS reform legislation and under this court's decisions in *Strunk* and *City of Eugene*. Consequently, we conclude there is no basis for any claim that Window Retirees were not timely paid all amounts they were due.

Although the *Arken* plaintiffs did aver in the trial court proceedings in this case that "PERS staff predicted that in some instances, the amount PERS owed certain retirees [for the not yet paid COLAs] would exceed the amounts owed by such retirees [for the overpayments]," they have made no showing in this record that PERB's prediction came to pass. The *Arken* plaintiffs cited PERB's Cross-Motion for Summary Judgment as the source for their contention, but in that motion PERB contended only as follows:

"First, PERS calculates the retroactive amount that it owes each affected member for the COLA freeze and other possible under-crediting identified in *Strunk*. Second, PERS calculates what amount, if any, the recipient owes PERS, based on recalculations using the correct 11.33 percent 1999 earnings crediting. Some affected members may not receive any payment for the first element (the COLA freeze reversal) because the amount they owe PERS will exceed the COLA freeze repayment. For those members, their payments to PERS will be reduced by the COLA

34

freeze repayment. Others may have the amount PERS owes for the reversal of the COLA freeze reduced by offsetting the recoupment. In either case, each affected member will receive the benefit of the *Strunk* decision. Plaintiffs conceded these facts, but try to paint the offset as a refusal by PERB to 'pay' the COLAs. Plaintiffs' MSJ, p 6. PERB has a right to offset the amount due to retirees by the amount they owe to PERS. *See* ORS 238.715."

We do not view that as an admission by PERS that there necessarily were any PERS members who would be owed money by PERS after the recalculations were completed. And, based on the record developed in this case and shown to this court, we are unaware of any individuals for whom the COLA amounts they should receive based on the 11.33 percent earnings credit allocation for 1999 are larger than the overpayments they have already received from the benefits that they have been given based on the 20 percent earnings credit allocation that was originally in place. The record shows only that the Window Retirees ended up owing overpayment amounts to PERS after they were credited with the COLA payments that had been frozen.

The essence of a wage claim is an assertion that one has not received payment from one's employer of "wages due and owing." ORS 652.120(1); *Allen*, 340 Or at 155. We are persuaded that, at the end of the recalculations conducted by PERS, the Window Retirees were provided with the correct benefit amounts taking into consideration the effects of both the earnings credit allocation reduction and the reinstatement of COLAs on the correctly calculated benefit amounts. Here, we need not decide whether Oregon's wage claim statutes apply to a claim that a PERS retiree is receiving less in retirement benefits than the amount to which the retiree is entitled because we determine that the Window Retirees timely received their retirement benefits

35

in the correct amount.

D.     *Declaratory and Injunctive Relief Under APA*

The *Arken* plaintiffs also seek declaratory and injunctive relief under the APA. They contend that PERB's action under ORS 238.715 to recover alleged overpayments was improper, because PERB did not make individualized determinations that a member did, in fact, receive amounts in excess of the amounts to which the member was entitled, that PERB did not provide the required notice to members before reducing their benefits, and that PERB continued withholding of COLAs after *Strunk* was decided.

The *Arken* plaintiffs' first claim for declaratory relief essentially contends that PERB could not continue to withhold COLA payments from Window Retirees on benefit payments for calendar years 2003, 2004, and 2005, after this court's decision in *Strunk* without first determining in an individual case whether the COLA payments owed to the individual member exceeded the reduction in that member's benefit caused by the reduction in the earnings credit allocation to 11.33 percent. The *Arken* plaintiffs assert that, for those members who were ultimately determined to be owed money by PERS because the COLA payments they should have received were greater than the benefit reductions caused by the 2003 PERS reform legislation, the continued withholding of the COLA payments was "contrary to ORS Chapter 238, outside the range of discretion delegated to PERB, and contrary to the fiduciary obligations under ORS 238.660 to pay all benefits owing when owed." The *Arken* plaintiffs do not develop those arguments, however, and we do not find them persuasive.

We conclude that PERB acted reasonably and within its statutory authority in determining that the best course of action was to simultaneously calculate the reduction in benefits caused by the reduction in the 1999 earnings credit allocation and the effect of reinstituting the COLA payments, and then to determine whether individual members owed money to PERS due to an overpayment or were owed money by PERS because the COLA payment amounts were greater than the earnings credit reduction.

Defendant PERB notes that this court issued its decision in *Strunk* on March 8, 2005, and PERB contends that it acted with diligence to reverse the COLA freeze promptly following *Strunk*. PERB relates that, at its subsequent Board meetings in March, April, September, and October of 2005, the Board developed rule modifications and staffing needs and undertook a comprehensive review of the various implementation methods that could be used to implement this court's decision in *Strunk* and the other changes called for under the 2003 PERS reform legislation and the settlement of the *City of Eugene* litigation. PERB is charged with serving as a fiduciary for the fund under ORS 238.601, and the methodology PERB chose avoided the need to go through two (or more) costly and time-consuming recalculation efforts while still ensuring that the individual members received all the benefits to which they are entitled. Under those circumstances, PERB did not abuse its discretion in developing the methodology it used to implement the various changes it was required to make, including "delaying" implementation of this court's *Strunk* decision so that it occurred simultaneously with the other necessary changes.

The *Arken* plaintiffs' second claim for declaratory relief is premised on their

37

assertion that, under ORS 238.715(4), PERB was required to give members notice of the overpayment "[b]efore reducing a benefit to recover an overpayment or erroneous payment." The *Arken* plaintiffs present that argument as if the continued withholding of COLA payments by PERB is the functional equivalent of seeking to recover an overpayment. That argument is inapposite on the facts here. In continuing to withhold COLA payments until the comprehensive recalculation of benefits could be completed, PERB did not affirmatively reduce member benefits. Rather, PERB maintained the status quo. And, in those instances in which PERB determined that overpayments would be recovered from Window Retiree accounts, PERB provided the affected members with the requisite notice and an opportunity for a contested case proceeding to challenge the amounts that PERB had determined were owed. In fact, PERB issued a letter that accompanied the Order Adopting Repayment Methods (the order challenged in this case). In that letter, PERB notified the Window Retirees, including the plaintiffs in this case that:

> "PERS will send a letter to each affected recipient that details the benefits received to date, the amount of the overpayment (or underpayment), and the methods to repay PERS the amount of the overpayment. PERS will send individual letters at the time PERS recalculates the recipient's benefits. We anticipate this process will begin in April 2006 and take up to three years to complete."

Plaintiffs' argument that PERB did not provide the required notice is misplaced.

Finally, the *Arken* plaintiffs' claim for injunctive relief is similarly without merit. As presented, the claim for injunctive relief is an alternative ground for relief based on the arguments presented under the other claims for relief. We have already

38

determined those claims to be unavailing.[18]

## III. *ROBINSON*

The *Robinson* petitioners (the Window Retirees) also challenge the PERB order issued on January 27, 2006, but from a different starting point. As noted above, the challenged PERB order required Window Retirees to repay overpayments they received based on the original 20 percent earnings allocation credited for 1999. The PERB order relied on PERB's authority pursuant to ORS 238.715 to recover overpayments directly from the Window Retirees. The *Robinson* petitioners sought both a declaration that the PERB order is unenforceable and an injunction prohibiting PERB from collecting any of the alleged overpayments except as permitted by Section 14b of the 2003 PERS Reform legislation (Oregon Laws 2003, chapter 67, section 14b, *as amended by* Oregon Laws 2003, chapter 625, section 31).[19]

In asserting their claims, the *Robinson* petitioners necessarily acknowledge, or at least assume for the purposes of their argument, that the amounts at issue (the amounts the Window Retirees have received based on the erroneous 20 percent earnings allocation, above and beyond what they would have received based on the revised 11.33 percent earnings allocation), constitute benefits *erroneously paid* to retired members as a

---

[18] The *Arken* plaintiffs also raise a second assignment of error asserting that the trial court erred in denying their motion for partial summary judgment on count one of their first claim for relief and on their second claim for relief. In support of that assignment of error, they rely on arguments that we have already addressed. We need not discuss those arguments further here; it is sufficient to state that we determine that the trial court did not err in denying plaintiffs' motion for partial summary judgment.

[19] The full text of Section 14b is set out at ___ Or at ___ (slip op at 11-12).

result of erroneous benefit calculation methods identified in the *City of Eugene* litigation. That is so because Section 14b applies only to recovery of the "cost of benefits erroneously paid."

Section 14b sets out two mechanisms for recovering those costs. First, under Section 14b(1)(a), PERB "may withhold cost of living increases under ORS 238.360 from a retired member whose benefit is greater than the correctly calculated benefit of the member until such time as the member's benefit is equal to the correctly calculated benefit." Second, under Section 14b(1)(b), PERB "may treat all or part of the present value of the benefits erroneously paid * * * as an administrative expense of [PERS], to be paid exclusively from future income of the [PERF], and to be amortized over an actuarially reasonable period not to exceed 15 years."

The trial court agreed with the *Robinson* petitioners that Section 14b applies to the benefits that the Window Retirees have already received based on the 20 percent earnings allocation determination. The trial court concluded that PERB had erred in relying on ORS 238.715 to recover overpayments, reasoning that Section 14b was intended to and did set out the universe of available remedies for recovery of excess benefits paid to Window Retirees based on the 20 percent earnings allocation determination. In addition, the trial court determined that this court's decision in *Strunk,* which voided the prohibition on COLAs under Section 10 of the 2003 PERS reform legislation, necessarily signaled that the mechanism of withholding COLAs set out in Section 14b(1)(a) is similarly void. The trial court, therefore, determined that the only available mechanism for PERB to recover the costs of benefits erroneously paid to the

40

Window Retirees was to treat those costs as PERS administrative expenses to be paid from future income of the PERF as provided in Section 14b(1)(b).

The net effect of treating the benefits erroneously paid to the Window Retirees as administrative expenses is that the costs of those benefits will be borne by all Tier One and Tier Two members of PERS with existing accounts as the administrative expenses are paid from future income of the PERF. That result was described in an exhibit that was presented to the PERB at its September 23, 2005, meeting, and made a part of the trial court record in this case:

"Normally, retirement allowances may not be treated as administrative expenses. Section 14b(1)(b) of HB 2003 * * * attempts to modify this rule. Assuming that HB 2003 validly amended the PERS statute to allow treatment of the benefit overpayments as administrative expenses, as qualified by Section 14b(2) * * * the excess benefits payments would be chargeable solely to earnings that would otherwise be credited to the remaining member regular accounts. Thus, Tier One and Tier Two members with existing regular accounts would subsidize the retirement allowances received and to be received by the so-called "window retirees" (those retiring between April 1, 2000 and March 31, 2004). This would likely result in the benefits payable in the future to those Tier One and Tier Two members to be lower than they otherwise would be.

"* * * * *

"Fiscal Analysis: Charging these overpayments to administrative expenses necessarily puts the burden of repayment on current members. Not only would their accounts be adjusted for the 1999 earnings over-crediting, but their future earnings would be reduced to pay for the amounts overpaid to retired members because administrative expenses are charged first against available earnings in a calendar year and, if there are none, paid for by employers. Future earnings do not generally affect currently payable retirement, withdrawal, or death benefits, so the 'window retirees' would receive the full benefit of the 1999 earnings over-crediting and not contribute to its recovery."

(Footnote omitted.)

41

On appeal, the *Robinson* respondents (local government respondents and respondent PERB) contend that the trial court made numerous errors in concluding that Section 14b required the benefits erroneously paid to the Window Retirees to be charged as PERS administrative expenses. We turn first to the arguments raised by the *Robinson* local government respondents and PERB contending that Section 14b does not apply to the overpayments made to the Window Retirees.

A.   *Section 14b's Application to the Overpayments to Window Retirees Based on the 20 Percent Earnings Allocation in 1999*

The *Robinson* local government respondents and PERB contend that Section 14b does not apply because the overpayments are not the result of an "erroneous benefit calculation" identified in the *City of Eugene* litigation. Judge Lipscomb, the trial court judge in *City of Eugene*, certainly identified PERB's 20 percent earnings credit allocation as a significant issue involved in that litigation, and, in fact, all parties agree that one of the major determinations made by Judge Lipscomb in *City of Eugene* was that PERB erred in making the 20 percent allocation determination. Judge Lipscomb found that PERB abused its discretion and erred as a matter of law in not adequately funding the contingency reserve and the gain-loss reserve in 1999, and Judge Lipscomb instructed PERB to issue a new, corrected earnings allocation determination for calendar year 1999.

The more narrow issue presented by the *Robinson* respondents, however, is whether that earnings credit allocation determination comes within the parameters of the terms "one or more of the erroneous benefit calculation methods" identified in the *City of Eugene* litigation within the meaning of Section 14b. The *Robinson* respondents argue

42

that there is a distinct difference between the 20 percent earnings credit allocation error

and errors such as using outdated actuarial factors and requiring employers to match

earnings from the Variable Annuity Program in the money match calculation, which they

agree are "erroneous benefit calculations" for purposes of Section 14b.

1.     *Plain meaning -- text and context of Section 14b*

The *Robinson* respondents argue that the plain meaning of the terms of

Section 14b distinguish between benefit calculation errors and overpayments resulting

from the erroneous 1999 earnings credit determination.  They rely in part on provisions in

the preamble of HB 2003, which describe the *City of Eugene* litigation as having

involved three different determinations by the trial court.  The *Robinson* respondents note

that the preamble describes the *City of Eugene* litigation as having found that PERB

> "paid benefits in excess of those authorized by law by:  (a) Unlawfully
> using outdated mortality tables *to calculate* retirees' monthly benefits; (b)
> Unlawfully requiring employers to match earnings in the employees'
> variable accounts when those employees' pensions *are calculated* under the
> 'money match formula'; and (c) Unlawfully abusing its discretion in failing
> to set aside adequate statutorily mandated reserves out of investment
> income while crediting imprudently large amounts of investment income to
> member accounts[.]"

(Emphasis added.)  The *Robinson* respondents contend that, because the first two

categories use the term "calculate," those are the only categories contained within the

terms "erroneous benefit calculation methods" as used in Section 14b.[20]  The *Robinson*

---

[20]     We note that the *Robinson* respondents emphasize the phrase "erroneous benefit calculations" rather than the phrase "erroneous benefit calculation methods," even though both phrases appear in Section 14b.  We think, in fact, that the terms "erroneous benefit calculation methods" more accurately set out the subject matter of Section 14b because those are the terms used to describe the errors identified in the *City of Eugene*

respondents also point to a similar difference in the terms used by Judge Lipscomb in the *City of Eugene* case to describe the errors that he found. Respondent PERB notes that the trial court's ORCP 67 B judgment refers to the PERB's error in requiring employers to match Variable Annuity Account earnings as an error that "caused benefits to be calculated" erroneously and refers to PERB's error in the use of outdated actuarial equivalency factors as causing PERB to have "calculated benefits" erroneously.

Although there is the linguistic distinction that the *Robinson* respondents note, their argument places an unwarranted emphasis on the term "calculate" as it is used in the preamble. First, the preamble itself describes three errors by PERB, not two, that led to payment of benefits to Window Retirees in excess of those authorized by law, including the error committed by PERB in failing to set aside adequate reserves while crediting imprudently large amounts of investment income to member accounts. Second, as the *Robinson* petitioners note, Section 14b provides that the section applies if PERB "is required to correct *one or more* of the erroneous benefit calculation methods identified in City of Eugene, et al." (Emphasis added.) The use of the terms "one or more" in referring to the errors identified in the *City of Eugene* litigation is telling when juxtaposed with the legislature's use of the terms "one or both" later in that same statutory section to identify the two cost recovery mechanisms provided in Section 14b(1)(a) and (b). Furthermore, neither the trial court judge involved in the *City of Eugene* case nor the legislature used the term "calculate" as precisely as the *Robinson* respondents assert. For

litigation.

example, in its Opinion and Order issued October 7, 2002, the trial court stated in its conclusion: "Upon remand, the Board must issue new employer rate orders for 1998 and 2000, and a new earnings allocation order for the 1999 investment year. These new orders will inevitably have a significant effect not only on the accounts of the petitioning employers, but also on each account in the system, including the accounts of individual members." We discern from that statement that the trial court understood the interrelated nature of the errors the court had found.

The earnings credit allocation is one of the basic building blocks for the calculation of PERS retirement benefits for those PERS members who have a regular member account in PERS. As this court stated in *Strunk*, "Every PERS member has a regular 'account' in PERS. The member's regular account consists of the member's contributions to the system and earnings that PERB has credited to those contributions." *Id.* at 158. This court also observed that,

> "[u]nder the Money Match [method of determining retirement benefits], a member's service retirement allowance is calculated by determining the sum of the actuarial equivalent of the member's account balances at retirement (the annuity component) and then adding a sum in an equal amount that is charged to the employer, *i.e.*, the 'match' (the pension component)."

*Id.* at 161. We agree with the *Robinson* petitioners that the earnings credit allocation determination is an integral part of the calculation of retirement benefits for all Tier One PERS members who retire under the Money Match method for determining a member's service retirement allowance, including the Window Retirees involved in this litigation.

As a conceptual matter, there is no real distinction between the types of

45

errors the trial court found in the *City of Eugene* litigation.  As the *Robinson* petitioners observe:

> "All of the *Eugene* errors were of the same kind -- the use of an incorrect value in calculating retiree benefits: the wrong earnings credit (20 % instead of 11.33%), the wrong actuarial factor (old instead of current) or the wrong employer contribution value (to match the variable account balance instead of regular account balance).  Though appearing at different points in the overall calculation of benefits, they were all equally 'calculation methods identified' in *City of Eugene* and covered by section 14b."

The *Robinson* respondents concede that the outdated actuarial factor error and the error in requiring employers to match the variable account balance come within the scope of erroneous benefit calculation methods.  We conclude, based on statutory text and context, that the earnings credit allocation error also qualifies as a benefit calculation methodological error.

2.    *Legislative history*

The parties, citing this court's decision in *Gaines*, 346 Or 160, all also point to pieces of the extensive legislative history surrounding enactment of the PERS reform legislation that they contend support their respective views about the purported scope and meaning of Section 14b.  Ultimately, however, the voluminous legislative history provides little clarity about the legislature's intent in enacting Section 14b.

First, as the trial court noted below, the Governor, who advocated for the 2003 PERS reform legislation, and the Legislative Assembly, which enacted the legislation, both were faced with difficult circumstances and an uncertain legal landscape.  As the trial court stated,

46

"The legislators and governor were faced with what seemed like insurmountable legal and financial problems and could not possibly have predicted how the Supreme Court would decide the *Strunk* and *City of Eugene* cases. They did their best to set up a legislative structure which would permit PERS to survive the differing potential outcomes and to be as fair as possible to the affected retirees, while not punishing the employers who at that point had prevailed in the early stages of *City of Eugene*."

Much of the legislative history presents generalities about the overall intent of the PERS reform legislative package, which are of little help in discerning the precise parameters of Section 14b.

Second, the proposed 2003 PERS reform legislation changed frequently during the legislative process, and much of the legislative history presented addresses versions of bills that the legislature ultimately did not enact. Those references to the legislative history, too, are not helpful in determining the scope and meaning of Section 14b as it was ultimately enacted.

Third, and finally, the legislative history that is directly relevant to Section 14b is confusing and conflicting, and in any event, not enlightening. For example, the *Robinson* respondents (PERB and local government employers) cite statements made by Senator Tony Corcoran, one of the carriers of HB 2003, who described the bill as having three major components, including correcting for the over-crediting of Tier One member accounts *and* correcting the errors identified in the *City of Eugene* litigation. They also cite statements by Deputy Legislative Counsel David Heynderickx, who noted that "Section 14b directs the board on how to recover the cost of erroneously paid benefits and tells them to do it in one or two ways or a combination * * * and that's of course in addition to the one that's already in the bill for the 1999 crediting." From these

47

statements, the *Robinson* respondents contend that the Legislative Assembly clearly intended Section 10 (discussed earlier in addressing the claims raised by the *Arken* plaintiffs) to be the only provision of the 2003 PERS reform legislation addressed to the 1999 earnings allocation crediting determination and that Section 14b clearly did not address at all the effects of the 1999 earnings allocation crediting determination, but rather addressed *only* other errors that the trial court identified in the *City of Eugene* litigation. Those statements are not conclusive and, in fact, are consistent with the determination that both Section 10 and Section 14b are addressed to the effects of the 1999 earnings allocation crediting determination, albeit coming at those effects in different ways.

For their part, the *Robinson* petitioners (the Window Retirees) refer us to comments presented to the Legislative Assembly by William F. Gary, counsel for *Robinson* local government respondents, who was also an active participant in the legislative hearings on the 2003 PERS reform legislation. Gary stated,

> "The court in the *City of Eugene* case identified a number of errors that the PERS Board made in administering the retirement system and told the board that it could not charge the cost of those errors to the employers. Section 14b provides two alternative methods for paying those costs."

The *Robinson* petitioners assert that Gary did not limit his comments to the actuarial and variable account errors and that his comments must be read to include the 1999 earnings allocation crediting determination as well. Here, too, we do not find Gary's comments conclusive, and petitioners' reliance on them is not availing.

Inasmuch as we determine that the legislative history is inconclusive, we

48

give it little weight and conclude that it does not alter our determination that the earnings credit allocation error comes within the scope of the erroneous benefit calculation methods identified in the *City of Eugene* litigation.

3. *Redundancy between Section 10 and Section 14b*

PERB presents an additional argument that it contends shows that Section 14b of HB 2003 was not intended to reach any of the effects of the 1999 earnings allocation crediting determination. PERB asserts that "If Section 14b is interpreted as applying to the correction of the 1999 earnings overcrediting, it is redundant with Section 10, which provides a clear remedy for this issue." PERB contends that interpreting Section 14b to apply to the earnings credit allocation error violates both the cardinal rule of statutory construction to give significance and effect to every part of a statute and the well-established principle to avoid interpretations of statutes that render portions of them redundant. *See, e.g.*, *Union Pac. R.R. Co. v. Bean*, 167 Or 535, 549, 119 P2d 575 (1941) (stating "'cardinal rule' of statutory construction that significance and effect shall, if possible, be accorded to every section, clause, word or part" of an act); *State v. Young*, 196 Or App 708, 713, 103 P3d 1180 (2004), *rev den*, 338 Or 583 (2005) ("Well-worn principles of statutory construction counsel us to avoid, if possible, interpretations, that render portions of a statute redundant.").

The *Robinson* petitioners counter that those two statutory provisions are addressed to different concerns -- they note that Section 10 is addressed to determining the proper level of future benefits (*i.e.*, by making changes in how future benefits will be calculated) and Section 14b is addressed by its terms to recovering the costs of benefits

49

already paid erroneously. As the *Robinson* petitioners state:

> "Section 14b, by its terms, deals with two methods for 'recover[ing] the cost of benefits erroneously paid,' while Section 10 is forward looking, providing solely for the adjustment of ongoing retirement allowances by freezing future COLAs. Section 10 makes no provision for recovering the cost of past overpayments. Indeed it allows continuing, albeit reduced overpayments until the lack of COLAs allows the proper benefit amount to 'catch up' with the actual payments."

We agree that the provisions of Section 10 and Section 14b are not redundant. Rather, they address different aspects of the effects of the 1999 earnings allocation crediting determination -- one looking forward and intended to establish the correct retirement service allowances for all Tier One members of PERS (Section 10) and one looking backward and intended to establish methods for recovering the costs of erroneously paid benefits already made to the Window Retirees (Section 14b). Furthermore, Section 14b provides two statutory mechanisms to recover the costs of erroneously paid benefits -- *viz.*, the COLA freeze set out in Section 14b(1)(a) and the treatment of those costs as administrative expenses under Section 14b(1)(b). Although there may be overlap between some parts of Section 10 and Section 14b (most notably the similar COLA freeze provisions) we do not perceive the provisions as a whole to conflict or be redundant. Rather, they are complementary provisions addressed to different issues.

In sum, we conclude that Section 14b was intended by the legislature to provide for recovery of the costs of benefits erroneously paid to retired members as a result of erroneous benefit calculation methods identified in the *City of Eugene* litigation. We further conclude that the erroneous earnings credit allocation determination made by

50

PERB in 1999 constitutes one of those erroneous benefit calculation methods. We therefore turn to analyzing the effects of Section 14b.

B.    Whether *Section 14b Provides the Exclusive Statutory Remedy For the Erroneous 1999 Earnings Credit Allocation*

    1.    *Statutory analysis*

        As an initial matter, we note that the Legislative Assembly used mandatory wording in Section 14b. Section 14b(1) states:

> "If the Public Employees Retirement Board is required to correct one or more of the erroneous benefit calculation methods identified in City of Eugene et al. v. State of Oregon, * * * the board *shall* recover the cost of benefits erroneously paid to retired members as a result of those erroneous benefit calculations by one or both of the following methods * * *."

(Emphasis added.) The legislature's choice of words is the best evidence of legislative intent. *Gaines*, 346 Or at 171. Consequently, as a preliminary matter, we conclude the terms of Section 14b set out a statutory requirement that PERB "shall" use one or both of the methods set out in that section to recover benefits erroneously paid to the Window Retirees -- and that those recovery methods are the only methods the legislature intended to authorize PERB to use.

        Despite the legislature's clearly expressed policy, both PERB and the local government employers contend that the terms of Section 14b should not be interpreted to provide the exclusive methods for recovering benefits erroneously paid to the Window Retirees. We address their arguments serially.

        PERB and the local governments both argue that, in context, the word "shall" in Section 14b should be interpreted as "may" and that Section 14b should,

51

therefore, be seen to supplement rather than supplant PERB's authority to use ORS 238.715 to recover benefit overpayments. They note that the legislature in its early deliberations on HB 2003 considered including an explicit statement that the Section 14b remedies were "in lieu of, and not in addition to, any action of the board taken pursuant to ORS 238.715." They assert that the Legislative Assembly's deletion of that provision from the enacted version of the bill shows that the legislature intended for PERB to retain authority under ORS 238.715 to recover any overpayments made to retired members. We are not persuaded. The legislature's omission of those terms is not sufficient to overcome the clear meaning of the mandatory terms that the legislature enacted. *See* ORS 174.010 ("In the construction of a statute, the office of the judge is simply to ascertain and declare what is, in terms or in substance, contained therein, not to insert what has been omitted, or to omit what has been inserted[.]").

The *Robinson* local government employers further contend that Section 14b by its terms is addressed only to recovering the *costs* of benefits erroneously paid to retirees. They then go on to contend that recovering the *costs* of such benefits does not equate to actually *recouping* the amount of benefits erroneously paid. The *Robinson* local government employers observe that the two methods of cost recovery set out in Section 14b do not actually recover any overpayments that have already been made. Rather, as they correctly note, the COLA freeze in Section 14b(1)(a) gradually eliminates the overpayments prospectively, but does not recover overpayments already made. And treating such overpayments as an administrative expense as called for under Section 14b(1)(b) provides a funding source for the cost of the overpayments (the funding source

52

being PERF funds that would otherwise go to fund all other PERS retiree benefits);
however, it does not recoup those overpayments or eliminate them.

Although those assertions about the actual effects of the cost recovery methods set out in Section 14b are accurate, we cannot ignore the fact that Section 14b states that "the board shall recover the cost of benefits erroneously paid" by one or both of the methods set out in subsections (1)(a) and (1)(b). We understand from the express terms used by the legislature that it intended Section 14b to set out how PERB would recover the costs of benefits erroneously paid to retired members based on errors identified in the *City of Eugene* litigation. The fact that the cost recovery methods that are established in Section 14b will not actually effectuate the intended cost recovery, as noted above, does not allow us to ignore the express statutory terms the legislature enacted. *See* ORS 174.010 (stating goal of statutory construction is "to ascertain and declare what is, in terms or in substance, contained therein, not to insert what has been omitted, or to omit what has been inserted"); *State v. Vasquez-Rubio*, 323 Or 275, 283, 917 P2d 494 (1996) (court will not redraft statute to avoid even purportedly absurd result).

Finally, the local government employers also contend that the trigger for the application of Section 14b -- *viz.*, that PERB be required to correct one or more of the erroneous benefit calculation methods identified in *City of Eugene* -- has never come to pass. In support of that proposition, the local government employers assert that the only way the trigger could be tripped was by a final court judgment imposing that requirement. The local government employers note that the *City of Eugene* litigation was

53

resolved by settlement, rather than by final judgment, and that this court ultimately determined that the settlement mooted the litigation and vacated the trial court judgment that had been in place. They argue, therefore, that PERB has not been required to correct the errors.

Under the terms of the Settlement Agreement that PERB entered into to resolve the *City of Eugene* litigation, PERB is bound to implement many of the terms of the judgment entered by the trial court. As noted, the Settlement Agreement itself states:

> "PERB will implement the judgment entered in *City of Eugene v. State of Oregon, Public Employees Retirement Board* ("the judgment") as follows, except in the event of a supervening change in law (such as by a legislative enactment or further court order):
>
> "* * * * *
>
> "1.3 The new 1999 earnings allocation order * * * will provide that the appropriate earnings allocation to Tier [One] regular member accounts is 11.33%, that 7.5% of the 1999 earnings should have been allocated to the contingency reserve established by ORS 238.670(1), and that the gain-loss reserve created by ORS 238.670(3) should have been funded to the full extent of the former PERB's policy to maintain a gain-loss reserve sufficient to credit the assumed interest rate to Tier [One] regular member accounts during a period of 30 months of 0% earnings. * * * The order shall provide that if sections 5 or 10 of 2003 Or. Laws c. 67 are declared to be invalid or unconstitutional by a final judgment entered by a court of competent jurisdiction or are repealed, or if a court of competent jurisdiction rules that PERB otherwise has failed to implement those provisions, then PERB will, within 30 days, adjust member accounts, the contingency reserve and the gain-loss reserve as described in this paragraph."

This court's decision in *Strunk*, which declared the COLA freeze provision of Section 10 to be invalid, provided the basis for paragraph 1.3 of the Settlement Agreement to be triggered. We conclude that PERB was required to correct one or more

54

of the erroneous benefit calculation methods identified in *City of Eugene* and that the cost recovery provisions of Section 14b were triggered.

For the reasons that follow, however, we determine that neither of the cost recovery mechanisms that the legislature enacted in Section 14b(1) can be applied to the Window Retirees. We first address the treatment of these costs as administrative expenses as provided in Section 14b(1)(b).

2.      *Treating costs as administrative expenses under Section 14b(1)(b)*

As noted, the trial court determined that the only available remedy was to treat these costs as an administrative expense.[21] This mechanism, however, does not recover any of the overpayments made to the Window Retirees. Instead, the net result of that determination is to spread the burden of those costs to all current Tier One and Tier Two PERS members by reducing the moneys available in the PERF to fund reserve accounts and to fund member accounts. Although neither the trial court nor the parties address directly the legal ramifications of the diversion of funds from some PERS members to other PERS members, we conclude that it is necessary to do so.[22]

---

[21]      Up to this point in the analysis, we agree with how the trial court ruled in the underlying proceeding. In summary, at this juncture the trial court determined that the COLA freeze mechanism contained in Section 14b(1)(a) suffered from the same flaws that this court found with Section 10, which caused this court to determine the COLA freeze provisions of Section 10 to be invalid in *Strunk*. Consequently, the trial court determined that the only available cost recovery mechanism was to treat the costs as administrative expenses under Section 14b(1)(b).

[22]      The record shows that the PERB itself noted and considered the trust fund issues raised by treating the overpayments to Window Retirees as administrative expenses before issuing the order challenged in this case. PERB, however, did not resolve those trust fund issues. PERB instead determined that it should use the

55

Fundamentally, the PERF is a trust fund to be used for the exclusive benefit of members and their beneficiaries. ORS 238.660(1) and (2) state, in part:

> "(1) The Public Employees Retirement Fund is declared to be a trust fund, separate and distinct from the General Fund, for the uses and purposes set forth in this chapter and ORS chapter 238A and ORS 237.950 to 237.980, and for no other use or purpose, except that this provision shall not be deemed to amend or impair the force or effect of any law of this state specifically authorizing the investment of moneys from the fund. Interest earned by the fund shall be credited to the fund. Except as otherwise specifically provided by law, the Public Employees Retirement Board established by ORS 238.630 is declared to be the trustee of the fund. * * *

> "(2) Until all liabilities to members and their beneficiaries are satisfied, assets of the fund may not be diverted or otherwise put to any use that is not for the exclusive benefit of members and their beneficiaries."

The express declaration of the PERF as a trust fund dates back at least to 1953 (*see* Or Laws 1953, ch 200, §10) and it has been carried forward continuously to the present. ORS 238.660 declares PERF to be a trust fund, declares PERB to be a trustee of that fund with fiduciary obligations, and requires that fund assets may not be diverted from the exclusive benefit of members. How fund assets are to be used, how the amount of member benefits are to be determined, and how a member will benefit from the growth in value of the contributions that accumulate in that member's account are fundamental components of the PERS system. Consequently, we determine that the trust fund obligations imposed by ORS 238.660 are a part of the statutory PERS contract.

---

overpayment recovery mechanism set out in ORS 238.715 because that mechanism more closely aligned recovering overpayment costs from those who had received the overpayments. Because we have determined that Section 14b mandates that PERB use either the administrative expense mechanism set out in Section 14b(1)(a) or the COLA-freeze mechanism set out in Section 14b(1)(b) to "recover" the overpayments, it is necessary for us to address and resolve the trust fund issues presented.

We note, that although a PERS member may not be entitled to any particular rate of growth in the member's account, beyond the assumed interest rate, the distribution of PERF earnings among the various accounts is a "zero-sum" matter: If overpayments beyond what should be charged are made to one account, then lesser amounts than should be allocated will be available for payments to other accounts. Here, if overpayments made to the Window Retirees are allocated as administrative expenses of the PERF, then a lesser amount of the PERF earnings will be available for distribution to the reserve accounts or to the accounts of all other PERS members with existing accounts. In other words, PERF earnings -- *i.e.*, assets of the fund -- that have been generated based on contributions from Tier One and Tier Two members of PERS would be diverted from the benefit of those members and their beneficiaries to the exclusive benefit of the Window Retirees. Such a diversion would violate the trust obligation of the board to use fund assets for the benefit of those members whose contributions generated the fund assets.

We find support for this conclusion in long-standing, general trust principles. Generally, trusts are to be administered in accordance with the trust instrument, and trusts created by statute, like PERS, "are administered as express trusts, the terms of which are either set forth in the statute or are supplied by the default rules of general trust law." *Restatement (Third) of Trusts* § 4 comment g (2003). The *Restatement (Third)* makes clear that a trustee has a duty of impartiality and, "with respect to the various beneficiaries of the trust," must administer the trust "impartially and with due regard for the diverse beneficial interests created by the terms of the trust."

57

*Restatement (Third)* § 79(1)(a).

The *Restatement (Second) of Trusts* (1959) more specifically states:

"If the trustee has made a payment out of trust property to one of several beneficiaries to which the beneficiary was not entitled, such beneficiary is personally liable for the amount of such overpayment, and his beneficial interest is subject to a charge for the repayment thereof, unless he has so changed his position that it is inequitable to compel him to make repayment."

*Restatement (Second)*, § 254. In addition, a comment to that general statement further explains:

"e. *Rights of trustee and of co-beneficiaries*. If the trustee makes an overpayment out of the trust estate to one of several beneficiaries, the trustee is entitled to maintain a suit against the beneficiary who is overpaid and is entitled to a charge upon the beneficiary's interest for the amount of the overpayment, and he is under a duty to the other beneficiaries to maintain such a suit or to enforce such a charge, unless he has himself made good to the other beneficiaries or has paid into the trust the amount of the overpayment, for which he is himself personally liable."

*Restatement (Second)* § 254, comment e. ORS 238.660 incorporates those general trust principles into the operations of the PERS, by prohibiting the diversion of trust fund assets to favor one set of beneficiaries of the trust over another.[23]

We think it significant, too, that the diversion of assets from Tier One and

_____

[23] ORS 238.660 serves to ensure that PERS will qualify as a tax-exempt governmental benefit plan. To qualify as a tax-exempt plan, the operation of PERS must comply with IRS nondiversion regulations, including 26 CFR § 1.401-2(a)(1), which provides, in part:

"Under section 401(a)(2) a trust is not qualified unless under the trust instrument it is impossible (in the taxable year and at any time thereafter before the satisfaction of all liabilities to employees or their beneficiaries covered by the trust) for any part of the trust corpus or income to be used for, or diverted to, purposes other than for the exclusive benefit of such employees or their beneficiaries."

Tier Two members to the Window Retirees, which was attempted by the 2003 PERS reform legislation, relates to overpayments to Window Retirees on their contributions and earnings of the PERF in 1999 and relates to benefits that will be available to all Tier One and Tier Two PERS members based upon work already performed by those members. As this court stated in *Hughes*,

> "[a]ccrued and accruing pension benefits are protected under Oregon Law. Oregon is in line with the theory of pensions which holds that pensions are a form of compensation and that employees acquire vested contractual rights in pension benefits."

314 Or at 20 (citation omitted).  In *Hughes*, this court held that a 1991 statutory amendment, which would have subjected PERS members' retirement benefits to state and local taxation, breached the statutory PERS contract insofar as it applied to PERS retirement benefits accrued or accruing for work performed before the effective date of that 1991 legislation. *Id.* at 36.

We conclude that categorically treating the erroneous overpayments to all Window Retirees as an administrative expense violates well-established trust fund principles that are embedded in ORS 238.660 because that treatment favors the Window Retirees over other beneficiaries of PERS.  Because those trust fund principles are part of the PERS statutory contract, that in turn violates the statutory contract rights of all Tier One and Tier Two members of PERS with existing member accounts.  Therefore, we determine that the administrative expense mechanism for cost recovery set out in Section 14b(1)(b) cannot be applied by PERB to all of the costs associated with the overpayments

made to the Window Retirees.[24]

3.      *Section 14b(1)(a) COLA freeze*

The COLA freeze mechanism in Section 14b(1)(a) is set out as an alternative means to recover the costs of the erroneous overpayments made to the Window Retirees. As a threshold matter, we note that the *Robinson* respondents (local government employers and PERB) contend that the arguments presented by the local government employers to support the COLA freeze set out in Section 14b were not preserved below. We conclude, however, that we need not decide that issue. We have determined, as set out above, that the legislature intended Section 14b to establish two exclusive methods of cost recovery for erroneous overpayments to the Window Retirees -- *viz.*, the COLA freeze in Section 14b(1)(a) and the administrative expense treatment in Section 14b(1)(b). Consequently, in addressing whether PERB's decision to use the cost recovery mechanism provided in ORS 238.715 is lawful, we must first determine whether the COLA freeze mechanism set out in Section 14b(1)(a) is a viable method of cost recovery. That is so because, if that COLA freeze mechanism is available, then by its terms, Section 14b requires PERB to use it as the method for cost recovery of overpayments to the Window Retirees. We turn, therefore, to the parties' arguments

---

[24]      We note that this result comports with the express terms of ORS 238.610(4), which provides: "Amounts payable as * * * retirement allowances shall not for any purpose be deemed expenses of the board * * *." We further note that whether the terms of ORS 238.610(4) and the terms of the trust obligation imposed by ORS 238.660 can be altered for contributions that will be made into the PERF based upon work to be performed in the future is an issue that is not before us, and we express no opinion on it.

regarding the legality of Section 14b's COLA freeze.

As a starting point, this court addressed the COLA freeze of Section 10 in *Strunk.* In *Strunk*, this court invalidated that COLA freeze because it violated the statutory contract rights of PERS members. The *Robinson* local government respondents contend, however, that the terms of the COLA freeze in Section 14b are different enough from the terms of the COLA freeze set out in Section 10 that a different result should obtain. They note that Section 10 called for the establishment of a "fixed service retirement allowance" and then froze COLAs on that fixed service retirement allowance. They contend that *Strunk* determined that the fixed service retirement allowance was itself a legislatively "determined allowance" of what a retiree was entitled to receive. The same analysis does not apply here, they reason, because the Section 14b COLA freeze would apply only to retired members who are receiving benefits greater than their correctly calculated benefits.

The *Robinson* petitioners counter by arguing that the local government employers misunderstand or misstate the full reach of the COLA freeze provision in Section 14b. They contend that when the full implications of Section 14b's COLA freeze mechanism are considered, there is no material difference between the two COLA freezes. As support, the *Robinson* petitioners assert that the terms of Section 14b "authorize PERB to withhold COLAs *on the entire benefit* of any retired member who received an overpayment."

Section 14b(1)(a) provides:

"The board may withhold cost of living increases under ORS

61

238.360 from a retired member whose benefit is greater than the correctly calculated benefit of the member until such time as the member's benefit is equal to the correctly calculated benefit."

We understand the terms of this statute, as the *Robinson* petitioners assert, to allow PERB to withhold COLAs on the member's benefit amount with no difference drawn between that part of the member's benefit that is correctly calculated and that part of the benefit that constitutes an overpayment. As the *Robinson* petitioners state, "Though some undefined part of the benefit named in section 14b may be overpayment, the statute freezes COLAs on the retiree's whole benefit, the great majority of which is not based on overcredited earnings." Although we do not agree that the statute itself *mandates* that COLAs be frozen on the entire benefit amount, the statute does *authorize* PERB to freeze COLAs on the entire benefit amount. To that extent, there is no material difference between the COLA freeze mechanism set out in Section 14b and the COLA freeze mechanism set out in Section 10 that this court invalidated in *Strunk*.

Consequently, we conclude that the COLA freeze mechanism set out in Section 14b is invalid for the same reasons that we struck the COLA freeze provision contained in Section 10 in *Strunk*. That conclusion then leads to the question: what is the appropriate remedy? Although Section 14b(1)(a) might be susceptible to a narrowing interpretation (*e.g.*, one that would preserve the COLA freeze for only those portions of Window Retiree benefits that constitute overpayments), we conclude that such an interpretation is not plausible in this instance.

First, such an interpretation would mean that the Window Retirees would indefinitely receive benefits in an amount that exceeds the benefits to which they are

62

entitled, because they would continue to receive their correctly calculated benefits with COLAs *and* they would also receive the additional overpayment amount (albeit without any COLA increase) in addition to their correct benefit amount. That would not accord with the legislature's intent in enacting Section 14b -- the legislature intended the provision to constitute a means to "recover the cost of benefits erroneously paid to retired members." Furthermore, rewriting the statutory provision to provide for overpayments to Window Retirees to continue into the indefinite future raises trust fund administration issues similar to those we discussed related to the treatment of overpayments as administrative expenses. Therefore, the correct remedy is to strike the COLA freeze mechanism set out in Section 14b in its entirety.

C.  *Availability of ORS 238.715 to Recover Costs of Overpayments to Window Retirees*

Although we have determined that both of the means enacted by the legislature in Section 14b to recover the costs of benefits erroneously paid to the Window Retirees are invalid, that does not necessarily mean that PERB is without any authority to recover those costs. As we stated in *Strunk* in invalidating the COLA freeze mechanism contained in Section 10, "[o]ur conclusion that [the] particular legislative action amounted to a breach of the PERS contract, however, implies nothing about PERB's -- or, for that matter, the legislature's -- authority to recover payments determined to have been paid from the fund in error." 338 Or at 224 n 58. Here, too, our determination that the cost recovery methods set out in Section 14b are invalid does not necessarily mean that PERB is powerless to recoup the costs of benefits erroneously paid to the Window

63

Retirees.

Indeed, in its brief in this court, PERB directly asserts that ORS 238.715 authorizes the board to recoup the overpayments to the Window Retirees at issue in this proceeding. For their part, the *Robinson* petitioners assert that this court should not reach this issue because, in their view, this issue should be remanded to the trial court for decision.

The *Robinson* petitioners note that they did not move for summary judgment on their ORS 238.715 claim below, and, because the trial court ruled in their favor on their Section 14b claim, they assert that it was not necessary for the trial court to reach the ORS 238.715 claim. The *Robinson* petitioners acknowledge, however, that the trial court granted summary judgment to them on both of their claims for relief -- including their ORS 238.715 claim. They contend, nevertheless, that the ORS 238.715 issue should be remanded to the trial court for further briefing because it was not necessary for the trial court to reach the issue and because the trial court did not set forth its analysis of the ORS 238.715 issue in its decision.

As we have noted, respondent PERB has directly raised the argument that ORS 238.715 provides PERB with explicit statutory authority to recoup the overpayments made to the Window Retirees. Inasmuch as the trial court reached the issue (albeit in a truncated manner) and respondent PERB has directly raised the issue in its briefing in this court, we think the issue is properly before us for resolution.

As we previously observed, ORS 238.715 has remained in place throughout all the events discussed above. The legislature did not repeal or amend that statute in its

effort to reform the PERS statutes in 2003.[25] By its plain terms, ORS 238.715 applies to overpayments such as those made to the Window Retirees involved in this case.

ORS 238.715 provides, in part:

"(1) If the Public Employees Retirement Board determines that a member of the Public Employees Retirement System or any other person receiving a monthly payment from the Public Employees Retirement Fund has received any amount in excess of the amounts that the member or other person is entitled to under this chapter and ORS chapter 238A, the board may recover the overpayment or other improperly made payment by:

"(a) Reducing the monthly payment to the member or other person for as many months as may be determined by the board to be necessary to recover the overpayment or other improperly made payment; or

"(b) Reducing the monthly payment to the member or other person by an amount actuarially determined to be adequate to recover the overpayment or other improperly made payment during the period during which the monthly payment will be made to the member or other person.

"(2)(a) Any person who receives a payment from the Public Employees Retirement Fund and who is not entitled to receive that payment, including a member of the system who receives an overpayment, holds the improperly made payment in trust subject to the board's recovery of that payment under this section or by a civil action or other proceeding.

"(b) The board may recover an improperly made payment in the manner provided by subsection (1) of this section from any person who receives an improperly made payment from the fund and who subsequently becomes entitled to receive a monthly payment from the fund.

---

[25]    As we noted in our discussion of Section 10 above, the legislative history of HB 2003 shows that the originally introduced version of the bill contained terms providing that the COLA freeze provisions were "in lieu of, and not in addition to, any action of the board taken pursuant to ORS 238.715." The legislature, however, struck that provision from the final version of the bill, leaving the provisions and reach of ORS 238.715 unaltered. Although we determined above that this legislative history was not sufficient to overcome the explicit terms used by the Legislative Assembly in Section 14b, we note that this legislative history is consistent with our determination that the express terms of ORS 238.715 should be given effect.

"(c) The board may recover an improperly made payment by reducing any lump sum payment in the amount necessary to recover the improperly made payment if a person who receives an improperly made payment from the fund subsequently becomes entitled to receive a lump sum payment from the fund."

Not only does ORS 238.715 provide explicit authority to the board to recover overpayments, ORS 238.715(2) states that persons receiving overpayments hold the overpayment amounts in trust subject to the board's recovery. Furthermore, ORS 238.715(8) provides that "[t]he remedies authorized under this section are supplemental to any other remedies that may be available to the board for recovery of amounts incorrectly paid from the fund to members of the system or other persons." Those statutory provisions not only authorize PERB to recover overpayments, they also set out a statutory means for the board to satisfy its trust obligations to ensure that all beneficiaries of PERS receive the retirement benefits they are due.

We conclude that the overpayment recovery authority granted to PERB in ORS 238.715 remains available for PERB to use to recover the overpayments made to the Window Retirees for three reasons. First, our conclusion is consistent with the legislatively stated intent in Section 14b to provide a means for PERB to recover the costs of overpayments made to the Window Retirees. Second, our conclusion comports with the legislative charge to the courts in ORS 174.010 to give effect to statutory provisions enacted by the Legislative Assembly by giving effect, in these circumstances, to the provisions of ORS 238.715. Third, our conclusion is also consistent with the trust fund principles set out in ORS 238.660 that prohibit PERB from categorically favoring some beneficiaries of PERS over other beneficiaries of PERS and that are part of the

66

statutory PERS contract.

Our review of the challenged PERB order shows that it complies with the provisions of ORS 238.715. PERB's Order Adopting Repayment Methods first notes that, in light of this court's decisions in *Strunk* and *City of Eugene*, and the settlement agreement the board entered to resolve the *City of Eugene* litigation, the board had determined that the earnings on Tier One regular member accounts for 1999 should be reallocated at an earnings rate of 11.33 percent. The order further notes that this recalculation will affect Tier One members who retired on or after April 1, 2000, and before April 1, 2004 -- *i.e.*, the Window Retirees -- among others. The order then states:

> "ORS 238.715 requires the Board to collect amounts paid in excess of the benefit amounts recipient is entitled to under ORS chapter 238. ORS 238.715 provides several methods by which the Board may recover such overpayments, but does not require the Board to make all of the methods available in every case.

> **"IT IS HEREBY ORDERED** that each recipient who, based on the decisions in *Strunk* and *City of Eugene*, including the settlement agreement in the latter case, has received benefits in excess of amounts that the recipient is entitled to under ORS chapter 238, shall repay the amounts overpaid using one of the following methods:

> "1. Each recipient shall repay the amounts overpaid in a single lump sum unless the recipient is receiving monthly payments.

> "2. Any recipient receiving a monthly payment will repay the overpaid amounts by actuarial reduction of their monthly payment pursuant to ORS 238.715(1)(b), unless the recipient elects to repay the overpaid amount in a lump sum by paying that amount within the time allowed in the explanation to be provided to the recipient by PERS.

> "3. If a recipient is due a payment from PERS other than a monthly payment, the amount overpaid shall be deducted from the recipient's next payment and subsequent payments, if any, until the amount overpaid is recovered."

The terms of the challenged order are within the authorizing provisions of ORS 238.715,

and we conclude that the *Robinson* petitioners' assertion to the contrary is without merit.[26]

Because we determine that PERB correctly applied ORS 238.715 to recoup the overpayments made to the Window Retirees, we determine that the trial court erred both in granting the Window Retirees summary judgment on their ORS 238.715 claim and in denying PERB's cross-motion for summary judgment on that claim. On appeal, we determine that PERB properly can recoup the overpayments made to the Window Retirees under ORS 238.715, and we remand this case to the trial court for entry of judgment in favor of PERB on its cross-motion for summary judgment.

The judgment of the circuit court in *Arken, et al. v. City of Portland, et al.*, Case No. 0601-00536, is affirmed. The judgment of the circuit court in *Robinson, et al. v. Public Employees Retirement Board,* Case No. 0605-04584, is reversed, and the case is remanded to the circuit court for further proceedings.

---

[26] The *Arken* and *Robinson* challenges to PERB's actions to recover the overpayments made to the Window Retirees are not the only challenges that have been made. We have also accepted certification of the appeal in *Goodson v. PERB*, S059056. *Goodson* presents several challenges to individual orders issued to certain Window Retirees that have determined the amounts of overpayments to be recovered and the methods of repayments to be used. The *Goodson* petitioners have asserted that the overpayment recovery orders are invalid for reasons that go beyond the question presented here as to whether the recovery of overpayments based on the 1999 earnings credit allocation are authorized by the terms of ORS 238.715. We address the additional claims raised by the *Goodson* petitioners in our opinion issued today in *Goodson v. PERB*, S059056.

68